966 So.2d 79 (2007)
STATE of Louisiana
v.
Clifton R. BOUDREAUX.
No. 2007-KA-0089.
Court of Appeal of Louisiana, Fourth Circuit.
August 15, 2007.
*80 Charles Foti, Attorney General, Darryl W. Bubrig, Sr., District Attorney, Belle Chasse, LA, And Gilbert V. Andry, IV, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Mary Constance Hanes, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY and Judge MAX N. TOBIAS JR.)
JOAN BERNARD ARMSTRONG, Chief Judge.
STATEMENT OF THE CASE
On January 26, 2005, the defendant, Clifton R. Boudreaux, was indicted on three counts of aggravated rape, violations of La. R.S. 14:42, and six counts of molestation of a juvenile, violations of La. R.S. 14:81.2.[1] The defendant entered pleas of not guilty to all charges at his arraignment on January 31, 2005. He withdrew those pleas on April 26, 2006. He then pled guilty to three counts of forcible rape, which charges were amended from the three counts of aggravated rape, and guilty as charged to the six counts of molestation of a juvenile. The court ordered a presentence investigation to be conducted. Sentencing occurred on June 20, 2006. The court sentenced the defendant to forty years at hard labor, without the benefit of probation, parole, or suspension of sentence for the first two years, on each of the three counts of forcible rape. As to the molestation charges, the court sentenced *81 him to serve fifteen years on each count. The court ordered that all sentences run concurrently with each other. The defendant filed a motion to reconsider on June 22, 2006 which the court denied on September 13, 2006. The defendant then filed a motion for appeal which was granted.
STATEMENT OF THE FACTS
Because the defendant entered guilty pleas, there is no trial transcript from which the complete facts of the offenses can be obtained. However, the record does contain material from which the basic facts can be obtained. In the defendant's statement he admitted sexually molesting his ten-year old daughter[2] S.C. over a three-year period, beginning when she was seven. The police report indicates that the victim told her aunt that, on October 25, 2004, her father molested her after she came home from school. The victim's aunt, R.R., reported the matter to the sheriff's department. R.R. reported also that she suspected that there had been prior incidents of molestation, and the victim had reported one to her mother K.B. previously. However, K.B. had not taken the matter to the authorities, but instead confronted the defendant who admitted to the allegation and promised not to do anything again. According to the victim's videotaped interview,[3] the defendant broke his promise and began abusing her again. The victim described multiple acts of molestation, vaginal and anal penetration, and incidents wherein the defendant forced her to engage in oral sex with him.
ERRORS PATENT
A review of the record for errors patent reveals that the sentence imposed on count nine is illegally lenient. Count nine was specifically charged in the indictment as a violation of La. R.S. 14:81.2(D), while the other five counts of molestation of a juvenile, were specified to be violations of La. R.S. 14:81.2(C). The difference in the elements is that, under paragraph D, the incidents of molestation recur over a period of more than one year, while paragraph C does not reference multiple incidents or a long time period of abuse. As to penalties, both provide a maximum term of fifteen years. However, the minimum under paragraph C is one year with no prohibition on parole. Under paragraph D, the minimum sentence is five years, and at least five years of any sentence imposed must be served without benefit of parole, probation, or suspension of sentence.[4]
Here the defendant specifically entered his guilty plea to count nine under paragraph D, and the court advised him of the correct penalty. Nevertheless, when the court sentenced him, it failed to include the statutory prohibition against parole, probation, or suspension of sentence for the first five years. However, Paragraph A of La. R.S. 15:301.1 provides that in instances where the statutory restrictions are not recited at sentencing, they are included in the sentence given, regardless of whether or not they are imposed by the sentencing court. Furthermore, in State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, the Louisiana Supreme Court *82 ruled that paragraph A of the statute self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence, which may result from the failure of the sentencing court to impose punishment in conformity with that provided in the statute. Hence, this Court need take no action to correct the district court's failure to specify that the defendant's sentence on count nine be served without benefit of parole, probation, or suspension of sentence for the first five years. The correction is statutorily effected. State v. Phillips, 03-0304 (La. App. 4 Cir. 7/23/03), 853 So.2d 675.
No other errors patent were found.
DISCUSSION
In his sole assignment of error, the defendant contends that the forty-year concurrent sentences imposed on the three counts of forcible rape are excessive. The maximum term of years which can be imposed under La. R.S. 14:42.1 is forty years, of which a minimum of two years must be served without benefit of parole, probation, or suspension of sentence. In this case, the court denied parole, probation, and suspension of sentence for only the minimum first two years. Thus, although the defendant received the maximum term of years on each count, he did not actually receive the maximum possible penalty.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, (La.App. 4 Cir. 3/16/99); State v. Francis, 96-2389, p. 6 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2984 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So. 2d 672, 677. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2984 at p. 9, 656 So.2d at 979; State v. Hills, 98-0507, p. 5 (La. App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.
A reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983). If adequate compliance with article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of this particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, 424 So.2d 1009 (La.1982).
The trial judge is given wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. State v. Walker, 96-112 (La.App. 3 Cir. 6/5/96), 677 So.2d 532, 535, citing State v. Howard, 414 So.2d 1210 (La.1982).
Here, the trial court had the benefit of a presentence investigation report as well as the audiotape of the defendant's confession *83 and the videotape of the forensic interview conducted with the victim at the Children's Advocacy Center. The record reflects that S.C. was not the first juvenile female with whom the defendant had tried to engage in sexual activity. In his interview the defendant admitted to attempting to molest his sister-in-law R.R., a step-sister, and a step-daughter from a previous marriage, all of whom were teen-agers at the time. Also, according to the presentence investigation report, the defendant's first wife was sixteen when they became romantically involved; he was twenty. They married when she became pregnant, and in exchange for marrying her, her family did not press criminal charges against him.
The defendant's criminal record was limited to convictions as a juvenile for burglary and criminal damage. As an adult, he had an arrest for simple burglary and an arrest in 1989 for contributing to the delinquency of a juvenile, but no prior felony convictions. The defendant reported that he had been molested multiple times as a child by an uncle, and thus believed for some time that sexual behavior with younger females was acceptable. He reported to the probation officer, and stated repeatedly and tearfully in the audio taped confession, that he learned that such behavior was sick and that he needed help to correct his behavior. However, he repeatedly denied ever penetrating his daughter with his penis (claiming any penetration was with his finger), insisting that, if she said he had, it was strictly accidental.
The defendant clearly minimized his actions. For example in her statement, S.C. recounted that the defendant had proposed that she entice her friends into touching him in a sexual fashion while he pretended to be asleep. Thus, it is apparent that he was prepared to extend his activities beyond his family members. Also, at one point in his statement, the defendant placed blame on S.C. for an act of molestation, claiming that she enticed him by coming out of the shower in a towel and sitting down in a sexually inviting pose; he also contended that she sometimes was wearing only panties and a t-shirt, thus enticing him.[5] Furthermore, S.C. recounted in her statement that he was able to keep her quiet about the abuse for some time by telling her that, if she told anyone, he would go to jail, she would have to go live with someone else, and her mother would take her little brother and no longer keep custody of her.[6]
In the presentence investigation report, the probation officer noted that the defendant repeatedly suggested that he was not a typical pedophile because he did not wish to assert control and was not a repeat offender. Thus, it was clear that the defendant by the time of sentencing had still not faced up to the full nature of his crimes. Additionally, throughout the taped statement, the defendant implied that many of the incidents were spur of the moment and somehow beyond his control. *84 The defendant never discussed his use of petroleum jelly which S.C. in her statement mentioned several times. S.C. told the interviewer that the defendant started using the jelly after S.C. complained of pain when the defendant was molesting or penetrating her. She said that he kept the jelly in his bedroom and would go and get it before he molested or raped her even in other areas of the house.
Again, the statements and presentence investigation report makes it abundantly clear that the defendant's behavior constituted a long-standing and escalating pattern of molestation and rape of juvenile females. He began with minimal or consensual sexual contact with teen-aged girls and then escalated to anal and vaginal rape, as well as forced oral sex with his seven-year old daughter. He attempted to have his daughter lure her young friends into sexual contact with him, which the probation department in its professional opinion believed to be a "classic example" of a pedophile. While admitting to many incidents of molesting his daughter, he denied any rape or intent to rape. He admitted to a few incidents involving other family members, but as noted by the probation officer, he only admitted to those incidents which were known to family and which they did not prosecute or report to the police. Although he expressed remorse in his statement, he had failed to seek any mental health or professional help when he had been found out on prior occasions, at most attending a church support group for victims of sexual abuse.
Finally, and perhaps the best indication of the fact that the defendant deserves the maximum punishment, is the defendant's conduct at the time of his guilty pleas. The court, after explaining the elements of rape charges, asked the defendant to explain what he actually did that made him guilty of the offenses. The defendant responded, "I can't recall. I just know I give a report, whatever y'all have, y'all have. I can't recall what you have on it." The court pressed the defendant, asking if he had any recollection of his offenses. The defendant said that he did not. Whatever remorse the defendant expressed on the audiotape of his statement, it appears that it was remorse for finally being prosecuted after years of sexually abusing children, not true repentance for what he had done.
During the sentencing proceeding, the trial court referenced the videotape of the victim's statement, the defendant's confession, the presentence investigation report, and the factors under La.C.Cr.P. art. 894.1. He invited defense counsel to offer anything in mitigation, and the counsel suggested that the defendant was a sick man who had been out of control, "came clean," and showed remorse. However, defense counsel also stated that he felt the presentence investigation report was "fairly accurate."
The defendant addressed the court when invited to do so. He stated that his daughter did not want to testify against him and was threatening to run away if forced to do so. The defendant claimed that he agreed to plead guilty without a sentencing agreement to spare her. However, he again contended that he never vaginally or anally penetrated the victim, and specifically noted that the physical examination done at Children's Hospital did not show physical evidence of penetration. The defendant then gave an account of the night before S.C. told her aunt about the abuse. He said that he saw S.C. sleeping and became upset over the things he had done. He stated that he began to cry and ask God "to take this stuff" so that he could break the "generational curse." The next day the police came to the house, which he said was a relief, and that he *85 then made the statement to the detective unburdening himself of his secrets. He insisted that if he thought he had penetrated his daughter, he would have told the detective he had, as the only way to cleanse himself was "to confess every, single [sic] thing that was ever done to me and from me." [Emphasis applied.]
The defendant also told the court about having attended a support group at a church, but that he stopped going because he believed that he had a "grip" on it. He said that he stopped abusing his daughter for a while, but began again after an accident which caused him to become disabled. The defendant once again, while trying to claim remorse, refused to take full responsibility for his actions, telling the court:
And in 2003, I was going through a lawsuit, and for the time that I was home, for that year and a half going through the lawsuit, that is when these things had occurred. A long period of staying home, without Christ in my life, just being home. You know, around the situation for Satan to attack me if you will.
I lost my dad in that period and just things evolved from there. I was just a mess. And I had to get my life straight, and that was the only way I do it, was to come clean and get my life straight.
The defendant emphasized his own status as a victim. He never mentioned his wife or young son, S.C.'s brother, and the consequences for them. He only briefly mentioned S.C. and that was to brag about the letter he wrote her telling her not to feel bad about reporting the abuse and advising her that, if somebody else ever hurts her, she should tell. The balance of what he wrote to S.C. was to tell her the things that had happened to him in his childhood and that he was ashamed at the time to tell anyone. Again, he quite clearly views everything through the prism of himself with no apparent consideration for any of the people who had suffered or were continuing to suffer because of his actions.
The court recognized the limitations on the defendant's remorse when it imposed sentence, noting his refusal to admit his actions at the time of the plea. The court noted that the victim in her interview was quite explicit regarding what was done to her, and that the details she provided convinced the court that penetration occurred. The court noted the defendant's history of inappropriate actions his "whole life." The court noted that, if not for the State's offer to reduce the charges, the defendant would receive a life sentence or possibly even a death sentence. The court acknowledged that the defendant's own experience of being molested might explain why he became a molester, but the court felt it was not of consequence at this time. In the court's analysis, the fact that the defendant was once a victim of abuse was overwhelmed by the fact that the defendant molested his victims solely for his own gratification. In the court's opinion, the defendant is essentially a sociopath who worried only about his own desires and gratification with no regard for his victims. Finally, the court discussed at some length the consequences on S.C. of the abuse she suffered at the hands of her father.
The reasons given by the trial court show sufficient compliance with La.C.Cr.P. art. 894.1. The next inquiry is whether the sentence is excessive in light of sentences imposed by other courts in similar circumstances.
In State v. Gray, 36,389 (La.App. 2 Cir. 9/18/02), 828 So.2d 176, as in the instant case, the defendant pled guilty to two counts of forcible rape involving the same victim in a plea agreement which reduced the offense from aggravated rape, and received the maximum forty-year sentences to run consecutively. The sentences were *86 upheld because the record supported the trial court's myriad reasons for imposing the maximum sentences, including the defendant's lengthy criminal history which included crimes of violence against women, his claim that the women came on to him, the bargain which substantially reduced his sentencing exposure, the risk of great bodily harm to the victims, and the emotional impact the crimes had on them.
In State v. Adkins, 31,300 (La.App. 2 Cir. 11/9/98), 721 So.2d 1090, the defendant was indicted on three counts of aggravated rape of females under the age of twelve, and was convicted by a jury of two counts of forcible rape. The third count, which involved his own daughter, resulted in a not guilty verdict; the victims on the guilty counts were his girlfriend's daughters. The Second Circuit on appeal upheld the sentences of forty years on each count with two years without benefit of parole, finding that the record amply supported the trial court's belief that the defendant was the worst type of offender. The court noted the victims' emotional trauma and that the defendant's actions constituted aggravated rape for which he should have received life sentences. Furthermore, the trial testimony and information from the PSI showed that he violated his paternal role in the family unit that he repeatedly raped and threatened the victims, "who were part of a family unit in which he was the only father figure. The violation of the paternal role is, needless to say, egregious." Id., p. 11, 721 So.2d at 1096.
In State v. Brown, 33,501 (La.App. 2 Cir. 6/21/00), 764 So.2d 197, the forty-year sentence imposed, after the State reduced the charge from aggravated rape and the defendant pled guilty, was upheld. The defendant was classified as a fourth offender, and the trial court, with the benefit of a presentence investigation report, gave adequate reasons for the sentence.
In State v. Charles, 626 So.2d 404 (La. App. 4 Cir.1993), this Court upheld two forty-year sentences for forcible rape (one as second-felony habitual offender), with the first two years of each to be served without benefit of probation, parole or suspension of sentence, along with a maximum twenty-year sentence for attempted forcible rape, with all three sentences to be served consecutively, where the victim was the thirteen-year-old daughter of the defendant's girlfriend. As in the instant case, the trial court gave extensive reasons for imposing the sentence.
In State v. Rasberry, 564 So.2d 740 (La. App. 2 Cir.1990), the court upheld a forty-year sentence, with only the first two years imposed without benefit of probation, parole or suspension of sentence, where a father was convicted of the forcible rape of his eleven-year old daughter. The father had allegedly begun molesting his daughter when she was nine, and it continued at the rate of two or three times per week until he was arrested. As in the instant case, the trial court gave extensive reasons for the sentence.
In State v. Jackson, 597 So.2d 1188 (La. App. 5 Cir.1992), the court upheld a forty-year sentence for forcible rape, twenty years of which was to be served without benefit of probation, parole or suspension of sentence, where the victim was a fourteen-year old female and the defendant was an adult. Again, as in the instant case, the trial court gave extensive reasons for imposing sentence.
In State v. Greer, 553 So.2d 892 (La. App. 4 Cir.1989), this Court upheld a forty-year sentence for forcible rape, without benefit of probation, parole or suspension of sentence, where the defendant broke into the victim's home while she slept, placing a pillow on her head and sitting on it after she screamed. Once again, the trial court gave extensive reasons for imposing *87 the sentence on the first-offender defendant.
The sentence in the instant case does not appear to be that disproportionate to other sentences imposed in similar circumstances.
In summary, the trial court in this case more than adequately justified the sentences imposed. The record fully supports those sentences. Although in the brief counsel argues that the defendant, in his statement, demonstrated remorse, explained how he tried to fight his impulses, and did not blame the victim, the record shows otherwise as discussed above. The defendant appears to be one of the more egregious offenders for whom maximum sentences are reserved. This assignment of error lacks merit.
For the foregoing reasons, the defendant's convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Originally, the defendant had been charged on all counts in a bill of information filed under case number 04-6327. The defendant successfully quashed the bill on the grounds that violations of La. R.S. 14:42 must be charged in an indictment. All of the pleadings from case number 04-6327 were later transferred to the instant case.
[2] Any references to the victim's name in this opinion will be to her initials, S.C., only. Her mother's initials are K.B.; her aunt's initials are R.R.
[3] A synopsis of the interview the victim gave to a forensic interviewer is contained in the supplemental police report. The full interview is on the videotape which has been made a part of this record.
[4] Also, in order to be eligible for parole after five years, the defendant must have the approval of a licensed mental health professional who has examined him.
[5] Similarly, when discussing the attempted molestation of his sister-in-law R.R. when she was fifteen, the defendant stated that his wife was pregnant at the time and that R.R. " . . . was a tease . . ., you know, like coming on to you, and all. And so, I fell for that, you know, and all."
[6] The record indicates that the defendant and K.B., S.C.'s mother, were married twice. In the period between their marriages, the defendant was married to another woman, who after their divorce married the defendant's brother. Thus, this woman is both the victim's former step-mother and her aunt. Initially after the defendant's arrest, S.C. lived with her aunt R.R. and then back with her mother. Later, she went to live with her uncle and her aunt-stepmother with K.B.'s consent, while K.B. maintained custody of S.C.'s younger brother.