987 So.2d 398 (2008)
STATE of Louisiana
v.
Simuel SHAW, Jr.
No. 2007-KA-1427.
Court of Appeal of Louisiana, Fourth Circuit.
June 18, 2008.
*399 Keva Landrum-Johnson, District Attorney, Alyson Graugnard, Assistant District Attorney, New Orleans, LA, for State of Louisiana.
John Harvey Craft, Louisiana Appellate Project, New Orleans, LA, for Simuel Shaw, Jr.
(Court composed of Judge DENNIS R. BAGNERIS, SR., Judge EDWIN A. LOMBARD, and Judge Pro Tempore MOON LANDRIEU).
*400 DENNIS R. BAGNERIS, SR., Judge.
Defendant Simuel Shaw, Jr. was charged by grand jury indictment on February 24, 2005 with three counts of aggravated rape, all violations of La. R.S. 14:42. Defendant pleaded not guilty and not guilty by reason of insanity at his February 28, 2005 arraignment. The trial court denied defendant's motion to suppress the evidence on May 25, 2005. The trial court denied defendant's motion for release on July 19, 2006. On January 16, 2007, defendant withdrew his plea of not guilty and not guilty by reason of insanity and entered a plea of not guilty. On that same date the State nolle prosequied count three of the indictment. Following trial by a twelve-person jury on January 16-18, 2007, defendant was found guilty as charged as to counts one and two. On March 8, 2007, defendant was sentenced on both counts to life imprisonment at hard labor, without benefit of parole or probation, the sentences to run concurrently. The trial court denied defendant's motion for reconsideration of sentence. Defendant now appeals this final judgment.

FACTS
Defendant was charged with and convicted of two counts of aggravated rape for raping his daughter when she was under the age of thirteen.
Joann Verrett, a forensic interviewer with the Child's Advocacy Center in New Orleans, testified that the advocacy center employed a multi-disciplinary approach to deal with child abuse cases. She interviewed the then twelve-year old victim, S.S., on November 24, 2003.[1] She and the child were alone in the interview room, and the interview was recorded, both on audiotape and videotape. New Orleans Police Department Detective Harris and possibly a social worker, Valerie Bergeron, were watching and listening to the interview from another room. Verrett identified an audiotape and a videotape of the interview, and the videotape was played for the jury. Verrett also identified "drawings" of anatomical figures on which the victim had circled the parts of her anatomy defendant had touched and what part of his anatomy he touched her with. Both Verrett and the victim had signed their names on the drawings.
Verrett denied on cross examination that she spoke with the victim about what the victim might say during the interview. Verrett was unaware whether the victim had spoken about the abuse to anyone before the interview, including Det. Harris or anyone at the advocacy center. She did not know whether the victim's mother had told her what to say during the interview. Verrett replied in the affirmative when asked by defense counsel whether she recalled the victim stating that there had been a sticky substance in her underwear. Verrett confirmed that the first couple of times she asked the victim about the sticky or foreign substance after one alleged rape, the victim had said there had been no substance. Verrett also confirmed that the victim said that her "cherry wasn't busted," and that the victim said that meant she was still a virgin. Verrett did not know whether someone told the victim to tell her that her cherry had not been busted. Verrett also confirmed that in one part of the interview the victim said her father actually did not put his penis in her vagina, but perhaps right below it, or something along those lines.
On redirect examination, Verrett confirmed that when she was asking the victim *401 if she saw anything in her or on the floor, or see anything come out of her vagina, that was in reference to the incident that occurred on the victim's birthday, November 19, 2003. And Verrett confirmed that her follow-up question to the victim was a general one, to the effect: "Did you ever see anything like that at any other time?" Verrett said she did not know why the victim said her cherry was not busted, and she drew no conclusions from that statement.
Dr. Elie Wetsman was qualified by stipulation as a forensic pediatrician. The victim was referred to her for examination at Children's Hospital by University Hospital and Det. Harris. She interviewed the victim on January 5, 2004, on which date the victim was having her menstrual cycle, thus necessitating a return visit on January 20, 2004 for a physical examination. The victim told Dr. Wetsman the last incident of abuse had been on November 19, 2003. Dr. Wetsman said the two-month delay in reporting was not unusual. She got the victim's medical history from the victim's mother before interviewing the victim. The mother was not present during the interview. Dr. Wetsman had not viewed any medical records at the time she interviewed and examined the victim, although she later did. Dr. Wetsman was questioned about LSU Medical Center records. The medical history in those records was that the victim related that her father touched her inappropriately and put his penis inside of her, and that it had happened several times in the past. The physical exam findings from that previous examination were normal, as were the findings during Dr. Wetsman's examination of the victim. She found no marks on the skin or anything abnormal in the genital area, or in the hymen. Dr. Wetsman confirmed that it was possible for a child to have had sexual intercourse and still have a normal hymen, and she stated that in fact most children in such situations have normal exams. She explained that the hymen is elastic, and that it can be stretched and return to normal. Dr. Wetsman did not perform a rape kit examination for DNA, fibers, or any evidence from the victim's body because the exam occurred more than two months after the last incident.
Dr. Wetsman confirmed on cross examination that she did not know whether the victim was telling the truth about had happened. She confirmed that the LSU physician's report of his examination of the victim reflected that the victim's hymen was intact. Dr. Wetsman said she did not use that terminology, but she interpreted his finding to mean that it was normal. Dr. Wetsman testified that a normal hymen is consistent with no sexual activity whatsoever, but is also consistent with being penetrated. The victim reported to Dr. Wetsman that she began menstruating at ten years of age. Dr. Wetsman replied in the negative when asked on redirect examination whether she would expect to find physical evidence of sexual activity on a child two, seven or eight months after a rape occurred. She also replied in the negative when asked whether she would expect to find acute injury on a girl two or six months afterward. Dr. Wetsman confirmed on recross examination that the victim reported vaginal penetration and yucky, sticky stuff coming out of her vagina. She also stated that her physical findings neither confirmed nor denied sexual abuse.
T.W., the victim's mother, testified that defendant was the father of her four children, including the victim, who was the oldest. She had been married to defendant since 1996. He lived with the family until November 2003. On the night of November 19, 2003, T.W., who at that time worked nights managing a Rally's fast food *402 outlet, came home from work after 2:00 or 3:00 a.m. When she came in the door she heard the bathroom door slam. She tried the bathroom door, but it was locked. She knocked. The victim was inside. She told T.W. that defendant had wanted to "see" her or "check" her vagina. She asked defendant to leave that night, but he did not. T.W. said she had heard defendant use the term "check" before, with regard to her. T.W. also said this was the second time she had heard that defendant tried to check the victim. After that previous occasion, which occurred in October, presumably in the same year, 2003, she had confronted defendant about it. Defendant said he had a right to check her because he was her father. She told him he did not. T.W. said she believed the victim the first time she told her of this, as well as the second time.
T.W. did not call police the first time the victim reported that defendant wanted to check her. She called defendant's sister instead. She did not call police until after a subsequent conversation with the victim, during which she told her mother that defendant put his penis on her vagina. That was her first time hearing about that. She delayed taking the victim to a physician because she thought an agency, "OCS," was going to do that. When T.W. learned otherwise, she took the victim to Charity Hospital and later to Children's Hospital. T.W. also took the victim to the Child Advocacy Center for an interview. T.W. said she did not recall having a conversation with the victim about her virginity. T.W. recalled receiving a letter from defendant about a year after the last incident, in November 2004. She recognized his handwriting. T.W. identified a letter shown her as the one defendant wrote to her in November 2004 while he was incarcerated for the instant offenses, and she read it to the jury.
T.W. confirmed on cross examination that there was nothing in the letter defendant wrote to her that said he raped the victim. She confirmed that nowhere in the letter did defendant apologize to her or his daughter for raping the victim. T.W. conceded that she and defendant once got into a fight because he thought he had caught her cheating, and he struck her once. T.W. also recalled another incident when she was walking in the front door and defendant was coming out. He tried to grab her hair and hit her, but she ducked and went inside. On that occasion the victim told her mother to escape into the bathroom with her, and they did, whereupon they locked the door. T.W. denied putting the victim between her and defendant on that occasion to protect herself. T.W. said that on the night of November 19, 2003, she had not heard any noises or screams coming from inside the house. She only heard the bathroom door slam as she turned the keys to open the door. She found defendant in bed relaxing, but not sleeping. He was not fully dressed, but she did not recall what he had on. The victim was dressed. T.W. recalled telling Det. Harris that when she spoke to her daughter that night she said nothing had happened. The couple's three other children were home that night. She did not know whether Det. Harris interviewed the other three children.
T.W. replied in the negative when asked whether she told the victim anything about what to say prior to the victim being examined by the doctor at LSU. T.W. said she would not tell the victim what to say, stating: "nothing but the truth." T.W. did not remember whether she told Det. Harris how she told defendant he did not have the right to "check" the victim or any other female, and that defendant said he would never do it again. Nor did she recall whether she had told Det. Harris *403 defendant had used the same language with her.
The victim's eleven-year old sister, S.S., recalled the morning of the victim's birthday, November 19, 2003. They were sleeping when defendant woke them up and asked them what they wanted for their birthdays. She recalled defendant went into his room and put on some shorts. The victim got out of her bed. S.S., the sister, heard the victim calling her name. She sounded scared. S.S., the sister, confirmed on cross examination that her mother told her she had to come testify in court. She replied in the negative when asked whether her mother told her what to say. S.S., the sister, admitted that she spoke to somebody in the district attorney's office. She talked to one person about what she would say in court, but could not remember who it was. She said her other sister and little brother were asleep on that night.
The victim, S.S., testified as to the first time defendant molested her. It was when the family was living on Magnolia Street. She was asleep in the top bunk bed. Defendant came and lay behind her. She jumped up and asked him what he was doing with her leg. He told her to lie down. He tried to push her down, and he got on top of her. She told him to get off of her. But, he pulled her shorts and drawers over. He then tried to put his penis in her. His hands were on the side of her. S.S. replied in the negative when asked whether he actually put it in that time. On another occasion, still while the family was living on Magnolia Street, she was sleeping in the bottom bunk next to her little sister, because she was afraid to sleep in the top bunk. She was asleep, and defendant called her to get him some Kool-Aid. He asked her to put the cup down. She came back into his bedroom to watch cartoons, because he was watching cartoons. She sat on the end of the bed. Defendant asked her to lie down, and she refused. He tried to put the cover over her. She moved the covers, and he put them over her again. He again told her to lie down, and she again refused. He got on top of her and moved her drawers and shorts over again. He then stuck his penis inside her. His hands were on the side of her. She knew it was his penis because it hurt. She said she screamed and cried. He told her to shut up and put his hand over her mouth. He also put a white sock in her mouth. He took his penis out of her vagina. She told him she had to pee, but he did not let her go. Then she told him she had diarrhea, and he let her go. She went straight to the bathroom. She did not tell anyone about it that day or the next week. She thought this incident had occurred around her eleventh birthday.
The victim testified that on the night of her twelfth birthday, she was sleeping in the bottom bunk bed with her brother and sisters when defendant came in the room and turned on the light at 2:30 a.m. He was wearing a T-shirt and boxer shorts, so the victim told him to put some clothes on. He came back wearing a pair of short pants. He talked to the victim and her sister about having a party for them. The victim lay back down, and her sister went into the front room. She came back and told the victim defendant wanted her. The victim did not want to go, but her sister pulled her out of the bed and they went into the front room. Defendant was talking to their mother on the telephone. He then told the sister to go back into her room. The victim told her sister to get some books. Defendant then told the victim that he wanted to "check her out." The victim told him no. Defendant started talking about boys disrespecting her. The victim retorted that defendant was disrespecting her. The sister came back in the room with some books, and defendant told *404 her to go back into her room. The victim told the sister to put the books back in the closet, but asked her to stand by door where she could see into the front room. Defendant got up and turned off the light. The victim tried to run out the back door. Defendant told her not to do that, telling her she had to lie back. The victim started crying and ran to her sister's room, then to her mother's room, and then back to the front room. She sat down in a rocking chair, and was she holding onto the leg of the chair so defendant could not pry her legs open. He eventually did. He then moved her drawers and her shorts over "again." He got on top of her and tried to put his penis in her. But she said it did not "go in the hole, ... [i]t went below the hole." The victim replied in the affirmative when asked if by "hole" she meant her vagina. She said she knew he was trying to put it in her vagina, that she felt pressure on it. She confirmed that she felt "a little less pressure" on her vagina on this occasion than the previous occasion when he put the sock in her mouth and placed his penis in her vagina. The victim said while defendant was doing this to her she was screaming her sister's name, but her sister never came to the front room. Defendant only stopped when he heard keys in the door. He got up and ran. The victim ran to the bathroom and said she was going to tell her mother. Her mother came in, came right to the bathroom door, and began knocking on it, asking who was in there. When the victim answered, her mother instructed her to open the door. The victim unlocked the door and told her mother defendant "tried" to have sex with her. Her parents fussed that night, but defendant did not leave that night.
The victim related that this was not the first time defendant had said he wanted to "check her out." She said it was around September or October when she came out of the bathtub with her bra and drawers on with a towel wrapped around her. Defendant called her. She walked in the front room, and he said he wanted to "check her out." The victim told him no, but he pulled her and touched her vagina. She ran into her mother's room and told her what happened. Her mother jumped out of bed, went into the front room, and argued with defendant. The victim's mother later told her not to walk out of the bathroom dressed like that anymore. The victim said there was another incident when she came home from school, but she did not want to talk about it. The victim admitted that when she talked with the first person she talked to about the abuse, a child protection woman, she did not tell her everything that had happened to her. She also said she told her mother most of what happened, but not everything. The victim said she talked to the woman who videotaped the interview  this would have been Joann Verrett. She also admitting talking with the assistant district attorney who was then questioning her at trial, as well as with someone else from the district attorney's office. The victim did not recall anyone saying anything to her about her "cherry," but said police officers who talked to her on Thanksgiving asked her if she knew what the term "virgin" meant.
On cross examination, the victim said she did not recall whether she told Det. Harris that on her birthday her father put his penis inside of her. She admitted that she told a male doctor that her father put his penis inside of her, and that some yucky stuff came out her vagina. She could not remember the order in which she talked to the various people. She remembered telling Dr. Wetsman that her father put his penis inside of her and that some yucky, sticky stuff came out of her. She recalled doing the interview that was videotaped. She did not remember speaking *405 with anybody before doing that interview. The victim said that when the first incident occurred, when she was on the top bunk bed and her father lay down behind her, he had only attempted to put his penis in her but had not. The second occasion was when she had been sleeping on the bottom bunk, when had asked her to bring him some Kool-Aid to his room. On that occasion defendant actually put his penis inside of her. His hands were on the side of her on that occasion. The victim confirmed that she told the assistant district attorney prosecuting the case that it really hurt. She was crying and screaming on this occasion, and this was when he put the sock in her mouth. Asked, rhetorically, that she had not told Det. Harris about that particular incident, the victim replied that she did not know. Queried about the third occasion, on her birthday, the victim replied in the affirmative when asked, rhetorically, that defendant put his penis near her vagina but not in it. She said it occurred on the floor, and that she was screaming because, although it was "less pressure," meaning than the time when he put his penis inside of her vagina, she was scared and crying. She assumed that on that occasion defendant had pulled down his shorts. She confirmed that he pulled up his shorts and ran away when she heard her mother's keys outside. She told Det. Harris defendant went into the bedroom; she guessed that he must have pretended to be asleep because her mother told her he was in the room lying down. Asked whether she talked to her mother about coming to court, the victim admitted that she told her that she was nervous.
The victim denied talking to anyone in the district attorney's office about what she would say in court. She did not recall using the word "cherry" when being interviewed on videotape. She admitted that she had heard the term from her mother. Asked if she knew what it meant, the victim said "[n]ot really, that you're a virgin is all." The victim was asked whether, during the course of the ordeal she ever told police, her mother, child protection, or anyone something that was not completely true about the abuse. She replied that all of it was true, but that she just never told everything. The victim admitted that someone from the district attorney's office went over the questions that were to be asked of her in court, but denied that she practiced what she said. She knew the answers to the questions. The victim recalled the incident when defendant hit her mother; she admitted she did not like that and did not want to see anything happen to her mother. She found the yucky, sticky stuff in her underwear after the second incident.
The victim replied in the affirmative when asked on redirect examination whether the assistant district attorney had always told her to be truthful and whether she had always been truthful. The victim confirmed that the incident in which defendant hit her mother occurred well before her November 2003 birthday.
Defendant testified that he had three other children besides the four he had with T.W. Prior to his arrest he had been physically unable to work, having been hurt on the job. Defendant had worked for Sheriff Foti as a reserve deputy sheriff. He had gone to the police academy. He was a high school graduate and went to America College, where he earned a certificate as a welder. Defendant had never been convicted of any crimes or been on probation for anything. Defendant turned himself into police on the charges in the instant case. He said T.W. had cheated on him. He said that made him jealous. Defendant admitted he hit T.W. to calm her down when she became hysterical after receiving a message on her cell phone. This was in 2002. On a second occasion in *406 2002 he saw T.W. getting out of a car one night that was being driven by a male whom he knew. That upset him. He "zinged" her on her head a little bit when she came inside. T.W. ran inside of the bathroom, and pulled the victim in front of her. Defendant admitted he "decked" T.W. in the eye, giving her a black eye "for a second."
Defendant stated that in the part of the letter he wrote to T.W. from prison where he said he "did it" because he was upset, he was referring to the fight where he hit T.W. in the eye. Defendant confirmed that, even though this fight had occurred more than a year earlier, it still was a problem in their relationship. Defendant also stated that in the part of the letter where he told his wife that she knew the truth, he was referring to her cheating on him. Defendant said that when he asked in the letter, "How could a man do something like this?" he was referring to striking his wife in front of his child. Defendant said the purpose of him referring in the letter to having been molested when he was young was to reveal something extremely private about himself to his wife in order to foster communication between them. He indicated that keeping that secret from his wife took something away from their relationship.
Defendant explained that he referred to himself as a monster in the letter because he was trying to get her to talk to him, and that he wanted her undivided attention. He said that when he referred in the letter to the victim saving his wife's life, he was referring to his wife putting the victim between her and defendant on the night he blackened her eye. He said that made him realize that he was getting out of control. Defendant confirmed that in the letter he referred to this wife cheating and to her receiving the strange phone call. Defendant said there was no particular reason he asked his wife not to come to court. He asked her to send him money because he needed different things. When asked why he wrote primarily about the victim, and not about his other three children, defendant said: "No particular reason." But he then replied in the affirmative when asked, rhetorically, whether she was the one who was present when the fight occurred. Defendant denied ever touching any of his seven children in an inappropriate way or raping them. He denied that he had ever touched, raped or had sexual activity with the victim. He confirmed that everything he had testified to was the truth.
Defendant was confronted on cross examination with the part of his letter in which he said that he was the only person who could help the victim, that nobody but him knew what changes the victim would go through. He denied that when he wrote that he was referring to the victim having been raped and molested. Defendant was asked why he referred to a monster still being inside of him three years after hitting his wife. He said there was no monster. Defendant replied in the affirmative when asked if he had lied. Defendant denied that someone named Osborne had raped or molested him, as he had stated in his letter to T.W. He denied ever sticking Osborne in the booty or Osborne sticking him in the booty, as he had stated in the letter. He denied lying about it, however, saying it was just something for him and his wife to talk about.

ERRORS PATENT
The record reveals one error patent. The mandatory life sentences imposed on defendant were illegally lenient. The sentences were to be served without benefit of probation, parole or suspension of sentence pursuant to La. R.S. 14:42(D)(2)(b). The sentencing transcript reflects that the sentences at hard labor were to be served *407 simply without benefit of parole or probation.[2]
However, La. R.S. 15:301.1(A) provides that the failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of parole, probation or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without the benefit of parole, probation or suspension of sentence. La. R.S. 15:301.1(A) deems that those required statutory restrictions are contained in the sentence, whether or not imposed by the sentencing court, and this paragraph self-activates the correction and eliminates the need to remand for a ministerial correction of an illegally lenient sentence resulting from the failure of the sentencing court to impose the restrictions. State v. Williams, 00-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799; State v. Boudreaux, 07-0089, pp. 3-4 (La.App. 4 Cir. 8/15/07), 966 So.2d 79, 81-82, writ denied, 07-1936 (La.2/1/08), 976 So.2d 717.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error defendant argues that the evidence is insufficient to support his conviction. Specifically, defendant argues that, considering what he characterizes as the victim's pretrial statements that there was no penetration as to either of the counts, there was insufficient evidence of penetration, a required element of the offense of aggravated rape.
When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, XXXX-XXXX, p. 8 (La.4/3/02), 815 So.2d 50, 55; State v. Hearold, 603 So.2d 731, 734 (La. 1992).
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.

*408 In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
La. R.S. 14:41 defines rape, in pertinent part, as vaginal sexual intercourse with a male or female person committed without the person's lawful consent; emission is not necessary, and any sexual penetration, when the rape involves vaginal intercourse, however slight, is sufficient to complete the crime. La. R.S. 14:42(A) defines aggravated rape, in pertinent part, as a rape committed where the vaginal intercourse is deemed to be without the lawful consent of the victim because the victim is under the age of thirteen years.
Defendant argues that it was only at trial that the victim reported that she was penetrated by defendant, and that in her earlier reports, including in the forensic interview, she consistently stated that there was no penetration. Defendant points out that in the forensic interview the victim maintained that she was still a virgin. He submits that accepting the trial testimony as to penetration, when she has consistently stated that there was none, is beyond the bounds of rationality.
During the taped interview, the victim talked about the first incident, where defendant put his penis "on" her. She then talked about the second incident, when defendant asked her to get him some Kool-Aid. The victim recounted the scenario in detail, clearly stating as to the point in time of penetration: "That's when he put his thing in me." This was entirely consistent with the victim's trial testimony concerning the second incident of abuse.
The victim also recounted during the taped interview the last incident of abuse, the one that occurred on her birthday, November 19, 2003. The victim recited the events, step-by-step, and got to the point when she was holding on the chair and defendant was trying to pry apart her legs. She then stated: "He got on top of me, and he took out his thing. He raped me. He, he put it in." This statement is inconsistent with the victim's trial testimony, where she clearly stated that defendant did not penetrate her on this occasion. At trial, the victim testified that on the occasion of her twelfth birthday, defendant put his penis below her vagina, stating that it did not go in the "hole," meaning her vagina. She testified that on this occasion she knew defendant was trying to put his penis in her vagina, that she felt pressure on it. She said the pressure she felt on her vagina on that occasion was a "little less" than she had felt during the second incident, when defendant put the sock in her mouth and placed his penis in her vagina. On cross examination, the victim replied in the affirmative when asked, rhetorically, whether defendant put his penis near her vagina but not in it on this occasion of her twelfth birthday. She also testified that on this occasion she was *409 screaming because, although it was less pressure, she was scared and crying.
When Dr. Wetsman testified she stated that the medical history in the victim's medical records was that her father had touched her inappropriately and put his penis inside of her, and that it had happened several times in the past. Penetration is consistent with the victim's trial testimony insofar as the second incident, but not as to the last incident.
As to the testimony concerning the victim supposedly stating that she still had her "cherry" and was still a virgin, it can be noted that Dr. Wetsman testified that the victim's hymen was still intact. Thus, perhaps the victim and/or her mother thought she was still a virgin despite having been raped.
For a rape to occur, emission is not necessary, and any penetration, however, slight, of the aperture of the female genitalia, even its external feature, is sufficient. State v. Murphy, 34,624, p. 6 (La.App. 2 Cir. 4/6/01), 785 So.2d 197, 202; State v. Bertrand, 461 So.2d 1159, 1161 (La.App. 3 Cir.1984).
In State v. Prestridge, 399 So.2d 564 (La.1981), the victim, ten years old at the time of the alleged rape, testified that the defendant rubbed his penis around, up and down, and across her vagina for about five minutes. She testified that the defendant's penis touched the entrance to the opening in her vagina, but that the defendant did not try to insert it all the way in as he had on a previous occasion. However, she further testified that it went in a "little bit" anyway. Prestridge, 399 So.2d at 569. The defendant argued on appeal that the victim's testimony negated the element of penetration, or at most was vague and inconclusive. The court concluded that, based on the victim's testimony, the jury, based on its common knowledge and understanding of the human anatomy, male and female, could have rationally found beyond a reasonable doubt that there had been sexual penetration, however slight.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169.
In the instant case, there is no internal contradiction or irreconcilable conflict with the physical evidence as to the victim's trial testimony or her taped interview that there was penetration of her vagina as to the second incident, when defendant asked her to get him some Kool-Aid and put a sock in her mouth when she was crying out while being penetrated. Any rational trier of fact could have found all of the essential elements of the offense of aggravated rape present beyond a reasonable doubt as to this charge of aggravated rape set forth in count two of the indictment.
However, as to the last incident, charged in count one of the indictment, the victim testified only that she felt pressure on her vagina, which she described as a "little less" than she had felt when defendant did put his penis in her vagina during the second incident. The victim said she knew he was trying to put it in her vagina because she felt pressure on it. The victim told her mother that night that defendant "tried" to have sex with her. Viewing all the evidence in a light most favorable to prosecution, no rational trier of fact could have found beyond a reasonable doubt that defendant penetrated her as to this last incident.
Accordingly, as to count one of the indictment, viewing the evidence in a light most favorable to the prosecution, no rational trier of fact could have found all the *410 essential elements of the crime of aggravated rape present beyond a reasonable doubt.
However, the evidence as to this third incident of abuse was that the victim resisted. She clung to a chair in the living room and tried to keep her legs closed. Defendant overcame her resistance and pried her legs apart. The victim testified that she knew defendant was trying to put his penis in her because she felt pressure on her vagina. This attack was interrupted when defendant jumped up and ran out of the room at the precise point when the victim heard her mother's keys on the outside of the front door, immediately before her mother came inside. Viewing all of evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the offense of attempted aggravated rape present beyond a reasonable doubt. La. R.S. 14:27[3]. Attempted aggravated rape is a responsive verdict to the charge of aggravated rape. La.Code Crim. Pro. art. 814(A)(8). When an appellate court finds the evidence is insufficient to support the guilty verdict returned, but the evidence supports a responsive verdict, the court may modify the judgment of guilty and enter a verdict of guilty of the lesser offense. See State v. Higgins, 03-1980, p. 18 (La.4/1/05), 898 So.2d 1219, 1232 (discharge of the defendant is neither necessary nor proper when the evidence presented at trial does not support the verdict returned but does support a responsive verdict or lesser included grade of the offense, citing State v. Byrd, 385 So.2d 248 (La.1980) and La.Code Crim. Proc. art. 821(E)).
There is merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant argues that the trial court erred in admitting evidence of other bad acts through the admission of the letter written by defendant to his wife while he was incarcerated for the instant offenses.
Defendant presumably filed a motion to suppress the letter, although the record does not contain a written one or specific evidence of an oral one. The motion was denied by the trial court after a hearing. Generally, before the State may introduce a confession or inculpatory statement into evidence, it must demonstrate that the statement was free and voluntary and not the product of fear, duress, intimidation, menace, threats, inducements or promises. La. R.S. 15:451; La.Code Crim. Proc. art. 703(D); State v. Jones, XXXX-XXXX, p. 10 (La.App. 4 Cir. 12/15/04), 891 So.2d 760, 769.
There was no evidence introduced at the hearing on the motion to suppress the statement because it was not disputed, and was impliedly admitted, by defense counsel that defendant wrote the letter to his wife freely and voluntarily and that it was not the product of fear, duress, intimidation, menace, threats, inducements or promises. Defendant made no argument at the motion to suppress hearing that the letter was inadmissible because it contained evidence of other bad acts or crimes. Thus, the trial court properly denied the motion to suppress the statement.
When the State introduced the letter at trial, through the testimony of defendant's wife, defendant objected, and an unrecorded *411 conversation was had at the bench between counsel for both sides and the court. After the letter was read to the jury by defendant's wife, defense counsel moved for a mistrial based on the fact that the letter contained evidence of other crimes.
Evidence of other crimes, wrongs, or acts is generally inadmissible to impeach the character of the accused. La.Code Evid. art. 404(B); State v. Blank, 04-0204, p. 39 (La.4/11/07), 955 So.2d 90, 123, cert. denied, Blank v. Louisiana, ___ U.S. ___, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007); State v. Prieur, 277 So.2d 126, 128 (La. 1973). The erroneous introduction of evidence relating to a defendant's prior bad acts risks "lur[ing] the fact-finder into declaring guilt on a ground different from proof specific to the offense charged ... [by] generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged...." State v. Ruiz, 06-1755, p. 7 (La.4/11/07), 955 So.2d 81, 86, citing State v. Womack-Grey, 00-1507, p. 1 (La.12/7/01), 805 So.2d 1116, quoting Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997).
Under La. C.E. art. 404(B), evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith, but such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. If the State intends to introduce such evidence for any of these permissible reasons, it shall, upon request, provide reasonable notice to the defendant of its intent to introduce such evidence. La. C.E. art. 404(B). Defendant in the instant case concedes that the State did provide such notice, but that it was directed toward evidence of additional sexually assaultive behavior toward the victim. This is correct. Defendant correctly argues that the State made no mention of violence against his wife or drug use.
Thus, defendant's argument in this assignment of error is that alleged references in his letter relative to violence against his wife and drug use constituted evidence of inadmissible other bad acts or crimes on his part.
The State introduced the letter because it contained material which a jury might interpret as references to his guilt for the two counts of aggravated rape for which he was being tried. The letter, much of which is very difficult to understand or make sense of, does not directly refer to defendant perpetrating violence against his wife. Defendant did refer in the letter to his wife receiving a strange telephone call and that her acting the way she did "made the monster come out of [him]." Defendant also wrote about other things pertaining to his wife from which it could be inferred that she was involved with another man. Nevertheless, it would be very difficult to infer from anything in the letter that defendant perpetrated violence against his wife.
Rather, evidence that defendant perpetrated violence against his wife, by hitting her, only came out during cross examination of the wife. That line of questioning was a part of a strategy employed by defense counsel to suggest to the jury that defendant's wife encouraged the victim to fabricate the allegations of sexual abuse because of an argument between the couple during which defendant hit his wife while the victim was present. In his opening statement defense counsel questioned why defendant's wife would delay reporting suspected sexual abuse of her minor daughter, stating:
You're going to find out that it had nothing to do with a rape. That it had nothing to do with him touching his *412 daughters. It had everything to do with him getting into an argument with [T.W.] about a matter that you all will hear about this morning. And you will find out that almost immediately after this argument, the allegation is made.
To that end, early in his cross examination of T.W., defendant's wife, defense counsel rhetorically asked her whether, prior to his arrest they had been having problems. Defense counsel followed that up by asking her about a telephone call she had received, and he asked her if she had gotten into a fight with defendant because he thought he had caught her cheating. T.W. replied that it was not a fight, and that defendant hit her one time. There was no objection by defense counsel to this answer by defendant's wife. Defense counsel then asked, rhetorically, whether they had gotten into a fight because he thought he had caught her cheating. T.W. replied in the affirmative, and defense counsel followed up by asking: "And he struck you, right? He hit you?" T.W. replied in the affirmative. Defense counsel continued with this line of questioning, eliciting from T.W. evidence of another incident in which defendant grabbed her by her hair to hit her, but she broke free and ran into the bathroom with the victim and locked the door.
Later, during defense counsel's direct examination of defendant, defense counsel again explored this area in great detail. Defendant testified that when he referred in his letter to his wife making the monster come out of him, he was referring to hitting his wife when he suspected her of cheating because of a telephone call or message she received. He further testified that he had also been referring to the incident when he tried to hit her after he saw her arrive home early one morning after work in a car being driven by a male with whom defendant was familiar.
The State did not introduce the letter to show evidence that defendant had perpetrated violence against his wife. Because the letter, read alone, does not explicitly state or even insinuate that he perpetrated violence against his wife, it did not, in this respect, constitute evidence of defendant's prior bad acts, i.e., bad character. Rather, as shown, it was defendant's strategy all along to attack the credibility of the victim and defendant's wife by calling into question her character and motive through the introduction of evidence that he hit her one time and grabbed her hair and attempted to hit her on another occasion because he thought she was cheating on him.
The other aspect of this assignment of error is defendant's reference in his letter to drug use. Defendant wrote that his wife knew he could have quit using drugs, but that he did not care to stop because of the pain he had inside. He continued to state that the doctors said that nothing was wrong with him, but that he knew something was wrong, and that he stayed in much pain. The letter does not make it clear whether defendant is referring here to the use of lawfully prescribed medication, such as for his back injury that apparently prevented him from gainful employment, or illicit drug use. Assuming for the sake of argument that this was a prohibited reference to other bad acts or crimes by defendant, meaning illicit drug use, any error in admitting such evidence was harmless.
The erroneous admission of other crimes evidence is subject to the harmless error analysis. Ruiz, 06-1755, p. 7, 955 So.2d at 86, citing State v. Johnson, 94-1379, p. 17 (La.11/27/95), 664 So.2d 94, 102. An error is harmless if it is unimportant in relation to the whole and the guilty verdict rendered was surely unattributable to the error. Blank, supra, XXXX-XXXX, p. 53, 955 So.2d at 133.
*413 Thus, the trial court did not err in admitting the letter into evidence insofar as it contained evidence relative to defendant's violence against his wife. Even assuming the trial court erred in admitting the letter insofar as it contained references to illicit drug use by defendant, considering all the evidence in the case, the guilty verdicts rendered by the jury were surely unattributable to such error. Thus, any error in admitting the letter was harmless.
There is no merit to this assignment of error.
For the foregoing reasons, we affirm the defendant's conviction and sentence as to count two of the indictment. As to count one of the indictment, we find that the defendant's conviction and sentence for aggravated rape be set aside, that a verdict of guilty of attempted aggravated rape as to count one be entered, and that the case be remanded for the imposition of sentence on the conviction of attempted aggravated rape.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND REMANDED.
NOTES
[1] The victim's initials are used throughout this opinion. See La. R.S. 46:1844(W)(barring public disclosure of the names of crime victims under the age of eighteen years and of victims of sex offenses, and authorizing use of initials, abbreviations, etc.).
[2] While the minute entry and commitment form reflect that the sentences were imposed without benefit of probation, parole or suspension of sentence, the sentencing transcript did not, and it controls. State v. Washington, 05-0431, p. 6 (La.App. 4 Cir. 12/7/05), 921 So.2d 139, 143.
[3] A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.