35 So.3d 1142 (2010)
STATE of Louisiana
v.
Troy BARBOUR.
No. 2009-KA-1258.
Court of Appeal of Louisiana, Fourth Circuit.
March 24, 2010.
*1143 Leon A. Cannizzaro, Jr., District Attorney, Matthew Caplan, Assistant District Attorney, New Orleans, LA, for Appellee, State of Louisiana.
John Harvey Craft, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge DENNIS R. BAGNERIS, SR., Judge MAX N. TOBIAS, JR., Judge ROLAND L. BELSOME).
MAX N. TOBIAS, JR., Judge.
The defendant, Troy Barbour, was charged by bill of information on 15 June 2006 with attempted second degree murder. He pleaded not guilty at his 14 August 2006 arraignment. The trial court granted Mr. Barbour's motion to suppress the identification in part, and denied it in part, and subsequently denied his motion to suppress his statement. He was tried by a twelve-person jury on 16-17 June 2008 and found guilty as charged. On 27 June 2008 the state filed a bill of information charging Mr. Barbour as a fourth-felony habitual offender.
On 1 April 2009 the trial court denied defendant's post-verdict motion to declare La.C.Cr.P. art. 782 A unconstitutional to the extent it allows for a non-unanimous guilty verdict in a non-capital felony cases. On that date the trial court also denied Mr. Barbour's motion for post-verdict judgment of acquittal and motion for new trial. He waived all legal delays and was sentenced to forty-eight years and six months at hard labor, without benefit of parole, probation, or suspension of sentence and granted his motion for appeal.

FACTS
Mr. Barbour was convicted of the 8 January 2008 attempted second degree murder of Donald Baker ("Baker").
Baker confirmed at trial that Mr. Barbour shot him several times on the evening of 8 January 2006. He knew Mr. Barbour as Michael Lee. Baker used to do remodeling and construction work. He hired Mr. Barbour after Hurricane Katrina, after someone brought him to his attention. Mr. Barbour was living in a car and was not eating, to-wit, starving. Baker said he *1144 gave Mr. Barbour a place to live and hired him. The defendant eventually found another place to live. On one sheet rocking and paneling job at the residence of Yolanda Jones, Mr. Barbour took a swing at Baker with a hatchet; Baker fired him. Baker subsequently felt sorry for the defendant and rehired him. Mr. Barbour took a swing at Baker again with a hatchet, and Baker told him that was it, and fired him.
Subsequently, Baker was working in Ms. Jones' residence cutting a wall outlet out of a piece of paneling with a jigsaw when something happened that caused him to think he had cut himself. He moved the piece of paneling to inspect where he had cut himself. He did not realize he had been shot until he stood up and looked to see Mr. Barbour shoot him the second time in the hip. Baker said he flipped off the defendant, and Mr. Barbour shot him a third time, in the armpit, breaking his shoulder blade in seven places. The defendant shot Baker a fourth time, in the left arm, and a fifth and final time, in his shoulder blade. He said Mr. Barbour pulled the trigger again, but the snub-nosed revolver was empty. Baker said the gist of what the defendant was saying to him as he shot him was that he was going to kill him. Baker said he moved to a different room and picked up a razor knife. When Mr. Barbour saw this he grabbed Baker's cell phone and left, telling Baker that he was going to bleed to death. The residence phone apparently had been reconnected, and Baker was able to call 911 for help. Baker told a police officer at the hospital that "Michael Lee" had shot him. On 9 January 2006, Baker was shown a photo of the defendant and confirmed that it was the person who shot him.
Baker confirmed on direct and cross examination that he was aware that while at the hospital his urine tested positive for cocaine. He said he had used cocaine a week and a half to two weeks prior to being shot. He replied in the negative when asked on direct examination whether he had taken or drank anything that would have caused him to not realize what was happening. Baker admitted on cross examination that he previously had been convicted of a crime, destruction of state property, for which he served a sentence of imprisonment. Baker denied on cross examination that he had ever threatened the defendant with a gun. Baker admitted threatening an unknown individual who had broken the windows in the vehicle he was driving. He admitted that after he fired Mr. Barbour he told him that he would mess him up if he ever got in sight of him. Baker said he delayed telling police who shot him until he got to the hospital because he was worried that the defendant might come back and shoot him again.
Robert Shafor, M.D., was a general surgeon on call at Slidell Hospital on 8 January 2006. He treated the Baker's gunshot wounds. The victim's wounds were around his shoulders, upper thighs, and the groin. His internal organs and blood vessels were fine, although one wound from a bullet that entered his upper thigh and exited around his scrotum gave him concern because it was fairly close to major blood vessels. Dr. Shafor confirmed that a hospital toxicology test for the presence of narcotics in Baker was positive for cocaine.
Yolanda Jones-Taylor ("Jones-Taylor") testified that after Hurricane Katrina she hired Donald Baker to put a new roof on her home and do some sheetrock work. Baker brought in the defendant to help him with the work. Jones-Taylor identified Mr. Barbour in court. She stated she never saw the victim intoxicated, but acknowledged Mr. Barbour called her to complain that the victim was not paying *1145 him. She eventually helped Mr. Barbour get a job sheet rocking with her son the week before the shooting. On the day of the shooting, a Sunday, Jones-Taylor brought the defendant some papers giving him permission to be on the property where her son was working. She picked up Mr. Barbour and dropped him off. Jones-Taylor went home. Baker was there working. The defendant called Jones-Taylor and told her he had forgotten the papers in her car. Jones-Taylor arranged to meet the defendant at a grocery store on Franklin Avenue and Leon C. Simon Boulevard. She left her home and went there, but never found the defendant. When she returned to her home, she found police there. Baker had been shot. She did not see Mr. Barbour afterwards, and did not hear from him until the next day, when he telephoned her to tell her he had shot Baker and that Baker was probably dead.
Jones-Taylor stated on cross examination that she did not tell Baker she was going to meet the defendant on the day of the shooting because she did not want him to know she was going to meet him. She confirmed that she knew of the feud between the two men and did not want to cause any more problems. Jones-Taylor also stated that she remembered when someone broke the windows on Baker's car, that Baker thought the defendant had done it, and that Baker was angry and upset about it. Baker told her he had a gun that he kept for his protection. She told Baker she did not want any guns in her home.
Alice Barthe ("Barthe") testified that her stepdaughter, Katy, and the defendant stayed with her and her husband in their Tylertown, Mississippi home, and later in a camper on their property from November 2005 until January 2006. A snub-nosed revolver she purchased around the first of January 2006, just after Christmas, was stolen from her home approximately four days after she bought it. It was stolen late Saturday night or early Sunday morning. Barthe said Mr. Barbour and his friend, Jamie, were in the residence that Saturday when she, her stepdaughter, and her husband went to an auction approximately an hour and a half drive away. When they returned Mr. Barbour and Jamie were gone, a Cadillac automobile was gone, and the revolver was missing from her nightstand. Barthe identified the defendant in court, as well as her revolver.
Ellis Barthe, Alice's husband, testified similarly to his wife. He said they did not get back from the auction until past midnight Sunday.
Susan Barthe, the mother of Katy Barthe, testified that Mr. Barbour and Baker did work on her home, and that the defendant dated her daughter. She identified some recordings made of telephone messages left for Katy on her telephone by Jones-Taylor and the defendant after Baker was shot.
Former New Orleans Police Department Detective Jeffrey Lehrmann testified that he responded to the scene of the shooting on 8 January 2006. The victim was in pain and not very cooperative. A spent bullet was recovered near where the victim was lying on the floor. Jones-Taylor drove up while he was there, and he took a statement from her. At the hospital, Baker told him who had shot him. Detective Lehrmann determined that Michael Lee and Mr. Barbour were the same person. Baker identified a photograph of the defendant. Mr. Barbour was eventually arrested. Mr. Barbour admitted to Detective Lehrmann that he used the name of Michael Lee. During his investigation Detective Lehrmann recovered the revolver stolen from the home of Alice and Ellis Barthe.
*1146 Charles Collins, a case manager for a drug court at Orleans Parish Criminal District Court, testified on behalf of Mr. Barbour that cocaine normally stays in a chronic user's system for three to four days and in a recreational user's system for three days.
New Orleans Police Department Sergeant Leonard Davis wrote a police report on the shooting. He testified that Baker told him that an unidentified white male came inside the residence where he was working, and stated: "Give me the money punk," then produced a handgun and shot him. Sergeant Davis admitted on cross examination that Baker's demeanor was fearful, among other things, and that he was in great pain. Asked whether his ability to interview the victim might have been hampered by his condition, Sergeant Davis replied: "Very much so."
Mr. Barbour testified that he was from Michigan. He mostly did construction work. He had been convicted of safe tampering, twice convicted of breaking and entering, for being a prisoner in possession of a weapon, and for issuing checks with insufficient funds. He was on parole from Michigan, and admitted that he had violated his parole by leaving Michigan without permission. He said that he had to get a job to remain on parole, but could not find one. He asked for permission from his parole officer to travel to New Orleans to find work, but permission was denied. He thought his parole would be revoked anyway if he stayed, because the cutoff period for him to find a job was approaching; thus he left. Mr. Barbour stated that he had never been convicted of a crime of violence. He arrived in New Orleans in September 2005, after Hurricane Katrina had struck. He used an alias, the name of a friend, because he was on the run for a parole violation.
Mr. Barbour said he met and worked with Baker in the area after Hurricane Katrina, and that they made pretty good money, which they split fifty-fifty at the beginning. He said that after working with Baker for about one week he discovered that Baker smoked crack cocaine. He said when Baker received money for work he performed, he would go to a crack house and be gone for a day, sometimes three days. He said when Baker used crack cocaine his eyes would get real wide and he would get aggressive and violent.
Mr. Barbour said Baker had a gun and he had seen it more than once. He said Baker was always shortchanging him and stealing the tools. Disputes over money and ownership of tools occurred. Baker threatened him all the time and had threatened him with a weapon. Baker once said that if he ever saw him again, he would shoot him. Mr. Barbour said that after the trouble between them, he had to leave Louisiana and move to Mississippi. He said that after the split with Baker, he got a friend from Michigan, Jamie Stone, to come to New Orleans and work with him on the job for Jones-Taylor's son.
Mr. Barbour stated that on the day of the shooting, Baker telephoned him to say that if he wanted his money he could come to Jones-Taylor's home to pick it up. He asserted that Baker owed him $3,200.00 for work he had done on Jones-Taylor's home. The defendant told Baker he would be over in a minute. He said that at first he was excited, but on the way there he thought about things and began to feel uneasy. He questioned why Baker now wanted to give him money, especially after everything that had happened. He said he approached Jones-Taylor's home with caution. He admitted that he had a gun, one he had taken without permission from Ellis Barthe in Mississippi. He said the gun previously introduced in evidence by *1147 the state looked like the one he took from Ellis Barthe. Mr. Barbour said he took the gun because Baker had made a lot of threats on his life and those of his loved ones around him.
Mr. Barbour said Jones-Taylor was not there when he went to her home. Baker answered the door, turned around, and started walking into the house. Baker accused the defendant of screwing him out of job, whereupon Mr. Barbour retorted that Baker had screwed himself. He asked Baker if he was going to pay him. Baker replied that he was. The defendant said Baker then reached behind a box and pulled out a .44 Magnum revolver with a six-inch barrel. Mr. Barbour claimed Baker reached around to take a shot at him. Mr. Barbour said he grabbed a halogen light and shined it in Baker's face. He said Baker fired a shot. The defendant then fired a number of shots at Baker, who dropped his gun. Mr. Barbour picked it up. He asked Baker if he was crazy and told him the money was not that important, that Baker could keep it. The defendant said Baker told him that it was not about the money. Mr. Barbour then ran out of the house. He discarded the gun in a debris pile alongside the street. He said neither he nor Baker pulled out a knife. He denied taking Baker's cell phone.
Mr. Barbour admitted hiding from police after the incident. When he was arrested, he did not tell Detective Lehrmann his story because he was not sure Baker would tell police he shot him, since Baker had tried to kill him. The defendant replied in the negative when asked whether, when he went to Jones-Taylor's house that evening, he had any intention of shooting Baker. He said that he shot Baker in self-defense.
The defendant said on cross examination that when he shot Baker, Baker was under the influence of crack cocaine. He knew that because he smelled it when he entered the residence, and because Baker's eyes were bulging and he was breathing hard. He denied ever having gone after Baker with a hatchet. After the shooting he jumped into the blue Cadillac in which his friend, Jamie, was sitting with engine running, and they left.
Jones-Taylor was recalled as a witness by the state. She testified that when the defendant telephoned her the day after the shooting he told her that he was sorry he had done it, but that at least he had gotten her out of the house. He told her he thought Baker was dead. She did not tell him that Baker was alive.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In this first assignment of error, Mr. Barbour argues that the trial court erred in denying his motion for a mistrial based on the state eliciting testimony from the victim concerning other crimes committed by the defendant.
The issue arose when the state was questioning its first witness in its case in chief, the victim. The state was eliciting from the victim a description of the events that occurred at Jones-Taylor's residence, where the defendant and the victim had been working, and where the shooting occurred. The state was directing questions to the victim concerning the defendant's work with the victim, and the following colloquy occurred:
Q. How long did the defendant actually do the sheetrock work with you inside that residence?
A. About a week, week and half, almost two.
Q. Did he help you finish it?
A. No.

*1148 Q. What happened?
A. He took a swing at me with a hatchet and I fired him. I felt sorry for him, brought him back. And he took another swing at me, and I told him that was it.
Q. And where did that second incident occur?
A. In the street in front of Yolanda's house.
At that point defense counsel objected. The jury was removed from the courtroom and Mr. Barbour's counsel moved for a mistrial, which the trial court denied. The trial court strongly admonished the state, and when the jury returned the court admonished it that it was to disregard the testimony as if it never occurred.
La. C.E. art. 404(B)(1) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The Supreme Court set forth the applicable law in State v. Rose, 06-0402, pp. 12-13 (La.2/22/07), 949 So.2d 1236, 1243-1244, as follows:
It is well settled that courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); State v. Williams, 96-1023, p. 30 (La.1/21/98), 708 So.2d 703, 725; State v. Prieur, 277 So.2d 126, 128 (La.1973). Evidence of other crimes, wrongs or acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." Prieur, 277 So.2d at 128. However, the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. La. C.E. art. 404(B)(1). The State must provide the defendant with notice and a hearing before trial if it intends to offer such evidence. Prieur, 277 So.2d at 130. Even when the other crimes evidence is offered for a purpose allowed under art. 404(B)(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. State v. Martin, 377 So.2d 259, 263 (La.1979); Prieur, 277 So.2d at 130. The State also bears the burden of proving that defendant committed the other crimes, wrongs or acts. State v. Galliano, 2002-2849, p. 2, (La.1/10/03), 839 So.2d 932, 933 (per curiam).
Although a defendant's prior bad acts may be relevant and otherwise admissible under La. C.E. art. 404(B), the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, *1149 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)("The term `unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). (Footnote omitted).
In addition to the notice requirement imposed upon the state by La. C.E. art. 404(B)(1), La.C.Cr.P. art. 720 states that, upon motion of the defendant, the court shall order the district attorney to provide the defendant with the state's intent to offer evidence of the commission of any other crime admissible under the authority of La. C.E. art. 404. The defendant's trial counsel filed a boilerplate pleading seeking an order from the court directing the state to comply with, inter alia, La.C.Cr.P. art. 720.
The state does not dispute that it did not give notice of its intent to use any evidence of any other crime committed by the defendant. Neither does the state argue that evidence that the defendant had swung at the victim with a hatchet on two occasions prior to the day he shot the victim five times was admissible under La. C.E. art. 404 or any other authority.
The state argues instead that, even assuming it failed to give notice and the evidence was inadmissible, the trial court did not clearly abuse its discretion in denying the motion for mistrial and/or that the error in admitting the evidence was harmless.
La.C.Cr.P. art. 775 states that upon motion by a defendant a mistrial "shall be ordered" when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by La.C.Cr.P. art. 770 (mandatory mistrial upon motion of the defendant when prejudicial comment made within hearing of the jury by the judge, district attorney, or a court official referring to, inter alia, another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible) or La.C.Cr.P. art. 771 (the trial court may grant a mistrial upon motion of the defendant if the court is satisfied that an admonition is not sufficient to assure the defendant of a fair trial when a remark or comment made within the hearing of the jury during trial or in argument is of such a nature that it might create prejudice against the defendant in the mind of jury).
Mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice to the defendant. State v. Leonard, 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. The mere possibility of prejudice is insufficient to warrant a mistrial. Id. Stated a slightly different way, "[m]istrial is a drastic remedy, and is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial." State v. Wessinger, 98-1234, p. 24 (La.5/28/99), 736 So.2d 162, 183. "The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion." Id.
The victim was the first witness to testify in the trial. His single statement referring directly to the defendant having swung at him with a hatchet is contained in the victim's trial testimony. In hindsight, considering the evidence that followed, we do not find that the trial court abused its discretion in implicitly finding that the statement by the victim did not cause substantial prejudice to the defendant such that he would not be able to receive a fair trial.
*1150 Moreover, the erroneous admission of other crimes evidence due to the state's failure to give the defense proper notice, or for any other reason, is subject to the harmless error rule. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 102; State v. Plaisance, 00-1858, p. 27 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1192. See also State v. Shaw, 07-1427, p. 25 (La.App. 4 Cir. 6/18/08), 987 So.2d 398, 412, writ denied, State ex rel. Shaw v. State, 08-1957 (La.5/15/09), 8 So.3d 574 ("The erroneous admission of other crimes evidence is subject to the harmless error analysis."). An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. State v. Robertson, 06-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172.
Mr. Barbour admitted shooting the victim. While he claimed self-defense, his testimony contradicted that of the victim and that of Jones-Taylor, at whose residence the victim was working on the day he was shot. Jones-Taylor's testimony indicated that she had been sympathetic to the defendant insofar as his employment plight and squabbles with the victim. She arranged for the defendant to work for her son doing sheetrock work. She testified that she and the defendant arranged to meet at a grocery store on the evening of the shooting so Jones-Taylor could give him some documents giving him lawful permission to be on the premises of the residence her son was working on in post-Hurricane Katrina New Orleans. Jones-Taylor left her residence to meet the defendant, but he was not at the location where they had agreed to meet. Jones-Taylor returned to her residence to find the victim shot. Mr. Barbour fled and continued to actively elude police, knowing he was wanted in connection with the shooting of the victim.[1] The defendant telephoned Jones-Taylor the day following the shooting, telling her he was sorry he had done it, but that at least he had gotten her out of the house. He admitted to stealing and taking a revolver to Jones-Taylor's residence for his meeting with the victim. Thus, testimony suggests that the shooting was planned by the defendant.
We note the existence of discrepancies in Baker's testimony. He denied owning a gun, but Jones-Taylor said that he told her he did own a gun. The victim lied to police at the scene of the shooting about who had shot him, only divulging the defendant's identity after he was taken to the hospital. The victim explained that he was afraid to name Mr. Barbour while in Jones-Taylor's home because he feared the defendant could be nearby.
Nevertheless, assuming arguendo (that the testimony by the victim that the defendant had on two occasions prior to the day of the shooting swung at him with a hatchet was inadmissible), viewing all of the evidence, it can said beyond a reasonable doubt that the guilty verdict rendered in the instant case was surely unattributable to the testimony itself or any error relative to the testimony.
We find no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In the second of his two assignments of error, Mr. Barbour argues that the trial court erred in denying his motion to declare La.C.Cr.P. art. 782 A unconstitutional to the extent that it allows for a non-unanimous verdict in non-capital felony cases.
*1151 La.C.Cr.P. art. 782 A states in pertinent part that "[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." The instant case was one in which punishment was necessarily confinement at hard labor. Mr. Barbour was tried by a twelve-person jury, ten of whom concurred to render the verdict of guilty as charged of attempted second degree murder.
The defendant argued in his written motion that La.C.Cr.P. art. 782 A violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.
In State Bertrand, 08-2215 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782 A violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. The Louisiana Supreme Court reversed, stating in its conclusion:
Due to this Court's prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that non-unanimous 12[-] person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Bertrand, 08-2215, p. 8, 6 So.3d at 743.
Bertrand is dispositive of defendant's argument in this assignment of error which we find is meritless.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence is affirmed.
AFFIRMED.
BELSOME, J., concurs with reasons.
BELSOME, J., concurs with reasons.
I write separately to acknowledge that historically, a defendant could not be convicted unless the jury verdict was unanimous. Arie M. Rubenstein, Verdicts of Conscience: Nullification and the Modern Jury Trial, 106 Colum. L.Rev. 959, 979 (2006)(citing Apodaca v. Oregon, 406 U.S. 404, 407 & n. 2, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972)(White, J., plurality opinion); see also State v. Williams (unpub.), XXXX-XXXX (La.App. 4 Cir. 1/27/10, 26 So.3d 321)(Belsome, J., dissenting). The concept of a unanimous jury verdict began as early as the fourteenth century. Apodaca v. Oregon, 406 U.S. at 407-08, 92 S.Ct. 1628)(citing 1 William Holdsworth, A History of English Law 318 (1956), and James B. Thayer, The Jury and Its Development, 5 Harv. L.Rev. 249, 295, 296 (1892)); see also Johnson v. Louisiana, 406 U.S. 380, 383, 92 S.Ct. 1643, 1644, n. 1, 32 L.Ed.2d 170 (Douglas, J., dissenting). Ultimately, however, the United States Supreme Court concluded that the Constitution did not require unanimous jury verdicts. Rubenstein, Verdicts of Conscience, supra, at 979 (citing Apodaca v. Oregon, 406 U.S. at 410-411, 92 S.Ct. 1628).
With regard to Louisiana jurisprudence, this Court recently followed State v. Bertrand, 08-2215 (La.3/17/09), 6 So.3d 738, in State v. Taylor, XXXX-XXXX, p. 8 (La.App. 4 Cir. 9/4/09), 21 So.3d 421, 426, holding that "[t]his recent jurisprudence [referring to State v. Bertrand] clarifies that La. C.Cr.P. art. 782(A)'s presumption of constitutionality *1152 remains intact." Additionally, prior to the Louisiana Supreme Court's decision in State v. Bertrand, this Court found that a defendant's argument that Article 782(A) was unconstitutional lacked merit, relying upon the First Circuit case of State v. Lee and noting the Louisiana Supreme Court's denial of writs in that case. State v. Tillman, XXXX-XXXX, p. 25 (La.App. 4 Cir. 3/4/09), 7 So.3d 65, 78 (citing State v. Lee, XXXX-XXXX (La.App. 1 Cir. 5/16/07), 964 So.2d 967, writ denied, State v. Lee, XXXX-XXXX (La.3/7/08) 977 So.2d 896, cert. denied, Lee v. Louisiana, ___ U.S. ___, 129 S.Ct. 130, 172 L.Ed.2d 37 (2008)). In so holding, this Court quoted the following language from State v. Lee:
These Supreme Court decisions [Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)] do not address the issue of the constitutionality of a non-unanimous jury verdict but rather, address the issue of whether the assessment of facts in determining an increased penalty of a crime beyond the prescribed statutory maximum is within the province of the jury or the sentencing judge. These decisions stand for the position that any fact (other than a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and approved beyond a reasonable doubt. See Apprendi, 530 U.S. at 490, 120 S.Ct. at 2362-63. Nothing in these decisions suggests that a jury's verdict must be unanimous. Accordingly, LSA-Const. Art. I § 17(A) and LSA-C.Cr.P. art. 782(A) are not unconstitutional and do not violate the defendant's Sixth Amendment right to a trial by jury.
State v. Tillman, XXXX-XXXX, p. 25, 7 So.3d 65, 78 (quoting State v. Lee, XXXX-XXXX, p. 4, 964 So.2d 967, 973 (emphasis added)). Therefore, until otherwise directed by the United States Supreme Court or the Louisiana Supreme Court, the trial court's denial of defendant's motion to declare La. C.Cr.P. art. 782(A) unconstitutional must be affirmed. I respectfully concur.
NOTES
[1] Flight is a circumstance from which guilt can be inferred. State v. Smith, 98-2645, p. 5 (La.App. 4 Cir. 1/26/00), 752 So.2d 314, 317-318; State v. Recasner, 98-2518, p. 3 (La.App. 4 Cir. 12/22/99), 750 So.2d 336, 338.