PAUL A. BONIN, Judge.
 

 _jjA less-than-unanimous jury convicted Larry Lawrence of the second degree murder of Lionel Freeman, Jr., a one-year-old child. The jury, over Mr. Lawrence’s objection, considered evidence of the facts underlying his earlier conviction for cruelty to a juvenile, which in that case was his seven-month-old daughter. The district judge denied Mr. Lawrence’s motions for new trial and for reconsideration of sentencing, and sentenced Mr. Lawrence to the mandatory sentence of life in prison, without benefit of probation, parole or suspension of sentence.
 
 See
 
 La. R.S. 14:30.1 B.
 

 In this appeal, Mr. Lawrence assigns five errors. He argues that the trial court erred in admitting the evidence of his prior bad conduct involving his young daughter. As we explain in detail in Part II, we conclude that the trial judge did not abuse her discretion in admitting that evidence. Mr. Lawrence also argues that the prosecution failed to exclude every reasonable hypothesis of innocence. In Part III we explain our conclusion that there was sufficient evidence on every element of |2the offense upon which a rational juror could find Mr. Lawrence guilty beyond a reasonable doubt of second degree murder.
 
 [1]
 
 Mr.
 
 *1005
 
 Lawrence argues in another assignment of error that his conviction is defective because the twelve-person jury’s verdict was not unanimous. We reject this argument, which we explain in Part IV, because we are obliged to follow the controlling authority of the Louisiana Supreme Court on this issue. Thus, we affirm Mr. Lawrence’s conviction.
 
 [2]
 

 We do, however, agree with Mr. Lawrence that the district court erred in denying him an opportunity for an evidentiary hearing on his motion for reconsideration of his life sentence. We explain in Part V our reasons for remanding the matter to the district court for a hearing at which Mr. Lawrence may attempt to establish that the mandatory sentence imposed upon him violates the constitutional prohibition against excessive punishment and provide specific remand instructions to the trial judge.
 

 We turn now, in Part I, to an introductory review of the background facts.
 

 I
 

 Little Lionel was pronounced dead at the hospital emergency room on February 5, 2004 after all attempts to provoke a cardiac response proved futile. During the initial intake and subsequent autopsy, several injuries to the child were | ^discovered. Lionel had extensive bruising on his face, head, chest, abdomen, and thighs. His internal organs, especially his liver, pancreas, and right adrenal gland, were severely lacerated; his liver had been nearly bisected by a seven-inch tear that had left only a 1.5 centimeter segment intact. When the child’s abdominal cavity was opened, a large amount of blood gushed out.
 

 The entire length of the spermatic cord had been damaged by someone grabbing the young boy’s scrotum and pulling it, drawing the spermatic cord back down through the inguinal canal, causing traumatic injury.
 

 Dr. Diane Kirby, the physician on duty when Lionel was brought to the hospital testified that his injuries were inconsistent with the suggestion that Lionel had been eating, sleeping, and playing as normal, as the resulting loss of blood into the abdomen would cause unconsciousness after only three to five minutes. According to Dr. James Traylor, who performed the autopsy, the only adequate explanation for Lionel’s injuries was the intentional infliction of bodily harm. His death was deemed the result of “blunt force injuries,” and even classified by the coroner as a homicide.
 

 The course of events leading to Lionel’s autopsy, and later the murder trial, began with the eviction of Lionel’s mother, Kay Williams, from her apartment in December 2008; Ms. Williams and Lionel came to live with their neighbors in an apartment on North Robertson Street. Angela Gerdes shared an apartment with her son, her two daughters, and her fiancé, the defendant Larry Lawrence. Some nights Ms. Williams would stay out until morning, leaving her son in the care of Ms. Gerdes
 
 *1006
 
 and Mr. Lawrence. Mr. Lawrence, in a taped statement made to the |4homicide investigators, stated that on the night of February 4, 2004, after Ms. Williams had gone out, he “played boxing” with little Lionel before putting him to bed. This might explain, according to Mr. Lawrence, some of the bruising and injuries, which would have been unintentional or accidental.
 

 On the early morning on February 5, 2004, Ms. Gerdes was awoken by Lionel’s crying, but she went back to sleep until her alarm later went off about 6:00 that morning, at which point she asked Mr. Lawrence to wake her children for school. After waking the children, Mr. Lawrence remained in the bedroom for a few moments and then cried out.
 

 According to Ms. Gerdes she entered the bedroom to see Lionel on the bed; Mr. Lawrence told her that Lionel was not breathing. Mr. Lawrence, though untrained in CPR, claims that he attempted to resuscitate the child, but the child vomited when picked up and then turned blue.
 

 Then, at 7:10 a.m., Ms. Gerdes called 911. In the call she stated that she had a child who had vomited a large amount of red-colored liquid, possibly while sleeping, and who was now choking and suffocating. She also stated that her flaneé was trying CPR on the child. She reported in the call that the child had fallen three feet from his bed to the ground at some point in the morning, but that he had seemed “alright.” Mr. Lawrence also got on the line during the 911 call and confirmed that the child had fallen out of bed and screamed when he hit the ground, but that he soon went back to sleep. When they returned later to wake the child, he was lying in a pool of vomit. According to Mr. Lawrence, the child had a bump on his head and over his eye before the fall.
 

 Both Ms. Gerdes and Mr. Lawrence said the child was blue, and that, while attempting mouth-to-mouth resuscitation, Mr. Lawrence had seen fluid coming out Rthe child’s nose. During the call, the operator instructed Mr. Lawrence to perform CPR on the child using the heel of his hand, which it turns out is an inappropriate method for resuscitating a small child.
 

 New Orleans Fire Department Captain Kenneth Mahler was one of the first rescue workers to see the child. When Captain Mahler arrived, he found the child lying on the bed face-up. The child was unresponsive, had fixed pupils, was cold to the touch, and displayed every indication that he was already dead. Nonetheless, Captain Mahler and the other first responders worked to revive the child for twenty minutes until EMS arrived and placed the child in an ambulance to transport him to the emergency room.
 

 The jury concluded that Mr. Lawrence killed Lionel.
 

 II
 

 In this Part we examine Mr. Lawrence’s claim that the trial court erred in admitting evidence of “other crimes, wrongs, or acts.” The “other crime” that the jury learned about was Mr. Lawrence’s conviction in 1989 for cruelty to a juvenile, a violation of La. R.S. 14:93 A, which provides in pertinent part:
 

 Cruelty to juveniles is:
 

 (1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child’s age shall not be a defense;
 

 [[Image here]]
 

 Ultimately, when he pled guilty, Mr. Lawrence admitted to beating his 7-
 
 *1007
 
 month-old daughter and burning her forehead with a cigarette. But the jury also | filearned that
 
 even while admitting guilt
 
 Mr. Lawrence explained his actions as
 
 accidental.
 
 At trial, former probation and parole agent Mack Summers testified that, as he reported in his presentence investigation report prepared for defendant’s sentencing, Mr. Lawrence claimed to have accidentally burned the infant in the forehead with a cigarette. Denying fault for the child’s bruises and contusions to her arms and legs, Mr. Summers noted, Mr. Lawrence “explained” that his four-year-old step-daughter was climbing on an old stereo and it collapsed, causing both the child and the stereo to fall on the infant victim.
 

 Here, Mr. Lawrence was charged with second-degree murder, a violation of La. R.S. 14:30.1, which is defined, in relevant part, as:
 

 A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
 

 (2)
 
 When the offender is engaged in the perpetration or attempted perpetration
 
 of...
 
 cruelty to juveniles, second degree cruelty to juveniles, ..., even though he has no intent to kill or to inflict great bodily harm.
 

 (emphasis supplied)
 

 “Intent” is an issue whether the prosecution is proceeding under subpart (1) or subpart (2), as cruelty to juveniles can also involve intent.
 
 See, e.g., State v. Bradford,
 
 259 La. 381, 393, 250 So.2d 375, 379 (1971). La. R.S. 14:10 describes criminal intent:
 

 (1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
 

 (2) General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the 17ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
 

 Mr. Lawrence indeed does not dispute that intent was a genuine and contested issue at his murder trial.
 

 Of course, the antithesis of an intentional act is an accidental act. The distinction between the two can mean the difference between, for example, the inapposite crimes of murder and negligent homicide.
 
 See State v. Stanford,
 
 204 La. 439, 446-47, 15 So.2d 817, 819 (1943).
 

 We consider now La. C.E. art. 404 B(l), which regulates the admissibility of the kind of evidence to which Mr. Lawrence objects and provides:
 

 (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
 

 While, generally, evidence of other crimes, wrongs, or acts is not admissible to prove a person’s bad character to show that he acted in conformity therewith, such
 
 *1008
 
 evidence may be admissible for other purposes, such as “proof of motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident.” La. C.E. art. 404 B(l);
 
 State v. Miller,
 
 98-0301, pp. 3-4 (La.9/9/98), 718 So.2d 960, 962.
 

 | RThere are also several other statutory and jurisprudential rules at play when considering the admissibility of this “other bad act” evidence, summarized in
 
 State v. Miller, supra,
 
 pp.
 
 3-4,
 
 718 So.2d at 962
 
 [3]
 
 :
 

 First, one of the factors listed in 404 B “must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible.”
 
 State v. Jackson,
 
 625 So.2d 146, 149 (La.1993). Second, the state is required to prove the defendant committed these other acts ...
 
 Third, even if independently relevant, the evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. j03.
 
 Finally, the requirements set forth in
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973), must be met. Thereunder, the state must, within a reasonable time before trial, provide written notice of its intent to use other acts or crimes evidence and describe these acts in sufficient detail. The state must show that the evidence is neither repetitive nor cumulative, and is not being introduced to show the defendant is of bad character. Further, the court must, at the request of the defendant, offer a limiting instruction to the jury at the time the evidence is introduced. The court must also charge the jury at the close of the trial that the other crimes evidence serves a limited purpose and that the defendant cannot be convicted for any crime other than the one charged or any offense responsive to it. (emphasis supplied.)
 

 A trial court’s ruling on the admissibility of evidence pursuant to C.E. art. 404 B(l) will not be disturbed absent an abuse of discretion.
 
 State v. Gibson,
 
 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220.
 

 [ciThe prosecution suggests that evidence of Mr. Lawrence’s prior conviction of cruelty to a juvenile was admitted to prove intent as well as lack of mistake or accident. Mr. Lawrence generally rebuts this assertion by arguing that admission of this prior bad act evidence was improper because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, violating the restrictions of La. C.E. art. 403. Mr. Lawrence does not argue that the other requirements for admission of prior act evidence, quoted from
 
 Miller, supra,
 
 were not met. Accordingly, we limit our discussion to whether or not the evidence was admissible to establish a statutorily-sanctioned purpose and whether or not its probative value was substantially outweighed by the danger of unfair prejudice.
 

 We first address whether evidence of the prior conviction was admissible for the purpose of establishing intent.
 
 *1009
 
 In order for other crimes to be admissible as evidence of intent, the prosecution must establish three prerequisites: “(1) the pri- or acts must be similar; (2) there must be a real and genuine contested issue of intent at trial; and (3) the probative value of the evidence must outweigh its prejudicial effect.”
 
 State v. Blank,
 
 04-0204, p. 41 (La.4/11/07), 955 So.2d 90, 124.
 

 The prior act evidence at issue here is sufficiently similar to the act of cruelty for which Mr. Lawrence was convicted. The instant second-degree murder conviction may be established by proof that the victim was killed in the perpetration or attempted perpetration of cruelty to a juvenile, and Mr. Lawrence previously pleaded guilty to a charge of cruelty to a juvenile.
 

 We now examine the similar issue of whether the bad prior act evidence was admissible for the purpose of proving absence of mistake or accident. In
 
 State v. Galliano,
 
 02-2849 (La.1/10/03), 839 So.2d 932, evidence of an incident in which the defendant had previously harmed his two-year-old victim was admissible to | inshow a lack of accident and lack of intent at his trial for second-degree cruelty to a juvenile. The defendant’s charge arose out of an incident in which the child sustained serious head injuries consistent with shaken baby syndrome.
 
 Id.,
 
 p. 2, 839 So.2d at 932. In the prior incident, the victim suffered a broken leg as a result of defendant applying excessive force to remove him from his car seat.
 
 Id.
 
 The defendant admitted to the act, but he claimed that the injury was an accident.
 
 Id.,
 
 p. 2, 839 So.2d at 933. In its decision, the Louisiana Supreme Court held:
 

 The evidence of the prior incident in which the victim sustained a broken femur when defendant pulled him forcefully from his car seat has probative value to show the improbability that the defendant acted without the requisite intent, or accidentally, when he, according to his own admission, shook the victim in the instant situation “to get his attention.”
 
 See, State v. Monroe,
 
 364 So.2d 570 (La.1980[1978]) (under the doctrine of chances, likelihood that defendant was required to kill twice in self-defense on successive nights at the same location was so remote that evidence of the other killing was admissible to negate self defense and lack of intent).
 

 Galliano, supra,
 
 p. 4, 839 So.2d at 934. Finding no abuse of discretion in the trial court’s ruling admitting the prior act evidence, the Court agreed that evidence of the prior incident had “independent relevance to the issues of intent, system, and absence of mistake.”
 
 Id.,
 
 p. 4, 839 So.2d at 934. Similarly, Mr. Lawrence has twice offered up his lack of intent to explain away the harm done to both his daughter and to Lionel. In his prior conviction, Mr. Lawrence pleaded guilty to the charge of cruelty to a juvenile because he “felt responsible,” but insisted that his daughter’s injuries were accidental and “could not be helped.” With respect to his murder charge, Mr. Lawrence admits to “play-boxing” with Lionel, yet he persists in his explanation that any injuries sustained by the child were purely accidental. Because Mr. Lawrence committed multiple acts of cruelty to children, because the |nacts are so similar, and because both are accompanied by excuses that the harm was accidental, evidence of his prior crime was admissible for the purpose of demonstrating intent and the absence of accident. This prior evidence has probative value to show the improbability that Mr. Lawrence, like the defendant in
 
 Galliano,
 
 acted either on accident or without the requisite intent.
 

 We now turn to Mr. Lawrence’s complaint that the prior bad act (or “propensity”) evidence introduced against him at his trial was unfairly prejudicial. In
 
 *1010
 
 doing so, we are guided by the provisions of La. C.E. art. 403, which provides: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.”
 

 We do not overlook the fact that this prior bad act evidence is highly prejudicial. The risks of such evidence are aptly described by the United States Supreme Court in
 
 Old Chief:
 
 “Although ... ‘propensity evidence’ is relevant, the risk that a jury will convict for crimes other than those charged — or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment — creates a prejudicial effect that outweighs ordinary relevance.”
 
 Old Chief v. United States, 519
 
 U.S. 172, 181, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (quoting then-Judge Breyer in
 
 United States v. Moccia,
 
 681 F.2d 61, 63 (C.A.1 1982)). Mr. Lawrence, like the defendant in
 
 Old Chief,
 
 relies on the risk of unfair prejudice. The question then becomes whether the probative value of the evidence (herein to show intent and absence of mistake) is substantially outweighed by this risk of prejudice.
 
 See Old Chief, supra,
 
 519 U.S. at 182, 117 S.Ct. 644; La. C.E. art. 403. Because we, like the trial judge, find that the probative value of the prior act evidence prevails, the admission of this evidence does not result in error. Under the circumstances of this case, although evidence of the prior 112incident is prejudicial, we cannot say it is “so inflammatory as to create an unacceptable risk of luring jurors ‘into declaring guilt on a ground different from proof specific to the offense charged.’”
 
 Galliano, supra,
 
 p. 4, 839 So.2d at 933 (quoting
 
 Old Chief v. United States,
 
 519 U.S. at 180, 117 S.Ct. 644).
 

 It often happens that evidence which is admissible for one purpose is not admissible for some other purpose, and in such cases the court will,
 
 upon request,
 
 restrict the evidence to its proper scope and instruct the jury accordingly.
 
 See
 
 La. C.E. art. 105. Although there was no such request by Mr. Lawrence at trial when this evidence was introduced, the trial court included a pertinent instruction before the jury deliberated on its verdict. Thus the final requirement for admission of prior bad act evidence, that the trial judge charge the jury with a limiting instruction, was met. As part of the jury instructions the trial judge explained:
 

 Evidence that the defendant was involved in the commission of an offense other than the offense for which he is on trial is to be considered only for a limited purpose. The sole purpose for which such evidence may be considered is whether it tends to show guilty knowledge, absence of mistake or accident, intent, system, motive or identity.
 

 Accordingly, the jury was properly instructed as to the limited scope for which the evidence of Mr. Lawrence’s prior conviction for cruelty to a juvenile may have been considered. Because evidence of Mr. Lawrence’s prior conviction was admitted for a proper purpose, was not substantially outweighed by the risk of undue or unfair prejudice, and otherwise complies with the requirements of La. C.E. art 404 B(l), we find that the trial judge did not abuse her discretion in admitting the evidence of Mr. Lawrence’s prior act of cruelty to his own daughter.
 

 _bni
 

 Mr. Lawrence argues that the evidence submitted at his trial was insufficient to support a verdict of guilty for second degree murder. It is well-established that a criminal conviction must be supported by proof of guilt beyond a rea
 
 *1011
 
 sonable doubt.
 
 In re Winship,
 
 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Review of the sufficiency of the evidence requires a determination of whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In
 
 Jackson,
 
 the United States Supreme Court defined the scope of this inquiry, stating that it “does not require a court to ask itself whether
 
 it
 
 believes that the evidence established at the trial established guilt beyond a reasonable doubt.”
 
 Id.
 
 at 318-19, 99 S.Ct. 2781 (quotations and citation omitted). Instead, the Court explained, “the relevant question is whether
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Id.
 
 (emphasis in original). This is known as the
 
 Jackson
 
 standard of review. The
 
 Jackson
 
 standard applies to all evidence, both direct and circumstantial, to test whether it is sufficient to prove guilt beyond a reasonable doubt to a rational jury.
 
 State v. Neal,
 
 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657;
 
 State v. Owens,
 
 30,903, pp. 3-4 (La.App. 2 Cir. 9/25/98), 719 So.2d 610, 614, writ denied 98-2723 (La.2/5/99), 737 So.2d 747.
 

 Mr. Lawrence was convicted of second degree murder, a violation of La. R.S. 14:30.1, which in pertinent part states that, “[w]hen the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles, second degree cruelty to juveniles, ..., even though he has no intent to kill or to inflict great bodily harm.” La. R.S. 14:93 defines cruelty to juveniles, in pertinent part, as “[t]he intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby | Uunjustifiable pain or suffering is caused to said child.” Second degree cruelty to juveniles, defined by La. R.S. 14:93.2.3 A(l), is “the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.” Finally, La. R.S. 14:12 defines criminal negligence as follows:
 

 Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
 

 Aside from the identity of the offender, all other elements of the crime of second-degree murder were established by direct evidence. The medical evidence introduced at trial, discussed
 
 infra,
 
 demonstrates that the injuries leading to Lionel’s death were the result of intentional acts of cruelty. Mr. Lawrence suggests that the element of his identity was based on only circumstantial evidence and that the prosecution did not establish his identity as the perpetrator beyond a reasonable doubt. In cases in which an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies. R.S. 15:438 states the rule as to circumstantial evidence: “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” By reading this evidentiary statute alongside the constitutional requirements of Jackson, the Louisiana Supreme Court recognized a test for evaluating the sufficiency of circumstantial evidence in
 
 State v. Shapiro,
 
 431 So.2d 372, 385 (La.1982) (on rehearing). In that case, the court stated that the evidence “must not only be sufficient to convict the defendant, but, in testing its sufficiency, it
 
 *1012
 
 must exclude 11Bthe [reasonable] hypothesis that somebody else committed the offense.”
 
 Id.,
 
 431 So.2d at 385 (quoting
 
 State v. Jenkins,
 
 134 La. 185, 63 So. 869 (1914)). Stated another way, on review of sufficiency of the evidence, the evidence must be consistent with guilt as well as inconsistent with a reasonable hypothesis of innocence.
 
 Id.,
 
 431 So.2d at 385 (other citations omitted).
 

 Mr. Lawrence appears to argue that he has proposed a reasonable hypothesis of innocence that has not been ruled out by the evidence. After examining Mr. Lawrence’s argument, we find that the evidence is inconsistent with his theory of innocence, and a reasonable factfinder could have found him guilty — on every element, including his identity as the perpetrator — of this crime beyond a reasonable doubt. Mr. Lawrence’s hypothesis of innocence suggests that Lionel’s injuries were either accidental or were inflicted by his mother, Kay Williams. The uncontro-verted medical evidence, discussed below, concluded that the manner of death was homicide, caused by blunt force injuries. Based on this evidence, we can not reasonably find that Lionel’s injuries were accidental.
 

 After examining Lionel’s body when it was brought to the hospital, Dr. Kirby concluded that Lionel had been cold or without circulation for “a few minutes to maybe thirty minutes, tops.” Furthermore, after the autopsy, Dr. Traylor concluded that, after receiving the kinds of injuries sustained by Lionel, he would expect him to survive for only three to five minutes. Dr. Traylor also noted that the injuries to Lionel’s liver and pancreas were most likely caused by one forceful blow: “at some point in time either the child was squeezed forcefully or punched in the stomach or rapid heel to the stomach.” Due to the amount of blood and blood clotting that Dr. Traylor observed during the autopsy, he noted that this injury was fatal: “This is not something that occurred right after the baby died,” he concluded, 11fiThe child would, at the very least, have been rendered unconscious from blood loss to the abdomen. Furthermore, Dr. Traylor explicitly stated that these injuries would
 
 not
 
 have been the result of CPR efforts: “Even if they’re doing it [CPR] incorrectly,” Dr. Traylor explained, “you’re not going to inflict this type of injury!,] and the hemorrhage that is associated with that injury implies that this child was alive. This is inflicted trauma that was done purposefully and is not accidental.”
 

 Moreover, Mr. Lawrence’s suggestion that the injuries were hot caused by him but rather by Ms. Williams is untenable and inconsistent with the evidence. Mr. Lawrence points to Yasmine Moseley’s testimony about Ms. Williams’ prior negligent treatment
 
 [4]
 
 of Lionel as well as the fact that she had seen bruises on Lionel’s body “before Larry and them even moved to the house where they were living,” to implicate Ms. Williams in Lionel’s death. However, Ms. Moseley testified that Ms. Williams was not in the same house as Lionel at the time of his death. The night that Lionel died, Ms. Williams went to Ms. Moseley’s house around ten or eleven o’clock at night, where she remained until the next morning when she received a phone call that her child was in distress. Regardless of whether Lionel was ever abused by Ms. Williams (or anyone else), the evidence indicates that she could not have been the individual who gave Lionel the injuries that led to his death.
 

 
 *1013
 
 Accordingly, we find that a jury could reasonably have found Mr. Lawrence guilty of second degree murder beyond a reasonable doubt as to every element of the offense. Along with the medical testimony that Lionel’s death was caused by |, intentional acts of cruelty, Mr. Lawrence’s admission of “play-boxing” with the child, his past act of cruel treatment of his own daughter, and the fact that he was the last person to see Lionel alive, tends to discount any other reasonable hypothesis of innocence. We cannot agree that the jury’s guilty verdict was based on insufficient evidence.
 

 IV
 

 We turn now to briefly address Mr. Lawrence’s claim, first raised by motion in the trial court, that La.C.Cr.P. art. 782 A which authorizes less-than-unanimous jury verdicts in specified felonies triable by twelve-person juries violates the Sixth and Fourteenth Amendments and on that account is unconstitutional.
 
 [5]
 
 Mr. Lawrence questions the continued viability of the plurality opinion in
 
 Apodaca v. Oregon,
 
 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), which decision
 
 [6]
 
 approved of Oregon’s use of less-than-unanimous juries. But the Louisiana Supreme Court, in a case in which the district judge had found Article 782 A unconstitutional, reversed with the following observation:
 

 Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
 

 State v. Bertrand,
 
 08-2215, 08-2311, p. 8 (La.3/17/09), 6 So.3d 738, 743.
 
 See also State v. Barbour,
 
 09-1258 (LaApp. 4 Cir. 3/24/10), 35 So.3d 1142. Suffice it to say that intermediate appellate judges, just like a trial judge, are “not at liberty to ignore the controlling jurisprudence of superior courts.”
 
 Bertrand, supra; see also State v. Barbour, supra
 
 (Belsome, J., concurring).
 

 V
 

 The mandatory sentence for a defendant convicted of second degree murder is life imprisonment at hard labor without the possibility of parole, probation, or suspension of sentence. La. R.S. 14:30.1. After trial, Mr. Lawrence filed a Motion for Reconsideration of Sentence pursuant to La.C.Cr.P. art. 881.1 A(l). At sentencing, Mr. Lawrence argued that this mandatory life sentence was excessive un
 
 *1014
 
 der the facts of the case, and that a lesser sentence should be imposed pursuant to
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993). The district court disallowed argument regarding the alleged unconstitutionality of the sentence, stating,
 
 “State v. Dorthey
 
 is not applicable in this case. There’s no minimum.” However, even when a sentence is mandated by statute, it may still be constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, or is nothing more than the purposeful imposition of pain and suffering and is grossly out of proportion to the crime.
 
 State v. Johnson,
 
 97-1907, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677. The district court erred in failing to consider Mr. Lawrence’s claim that his mandatory life sentence is unconstitutionally excessive.
 
 See State v. Rice,
 
 01-0215, p. 7 (La.App. 4 Cir. 1/16/02), 807 So.2d 350, 354-55. Accordingly, we remand this matter to the district court for an evidentiary hearing 119on Mr. Lawrence’s claim that his mandatory life sentence is excessive.
 
 See
 
 La.C.Cr.P. art. 881.4 C.
 

 REMAND INSTRUCTIONS
 

 We instruct the trial court to schedule an evidentiary hearing, which shall be contradictory with the prosecution, at which hearing Mr. Lawrence shall be permitted to introduce relevant evidence and argument that the imposition upon him of the mandatory sentence provided by La. R.S. 14:30.1 B violates his constitutional protection against excessive punishment. The prosecution shall be permitted to offer countervailing evidence and argument. Mr. Lawrence shall bear the burden of proof at the hearing.
 
 See
 
 La.C.Cr.P. art. 930.2.
 

 At the conclusion of the hearing, the trial court shall either deny or grant the motion for reconsideration. If the motion is denied, the defendant shall be allowed an appeal to this court.
 
 See
 
 La.C.Cr.P. arts. 881.2 A(l) and 912 C(l). If the motion is granted, the trial judge shall impose the most severe sentence which is not excessive and the prosecution as well as the defendant shall be allowed an appeal to this court.
 
 See
 
 La.C.Cr.P. arts. 881.2 B(l)(a) and (2), and 912 B(l)(a).
 

 DECREE
 

 The conviction of Larry Lawrence for the second degree murder of Lionel Freeman, Jr., is affirmed. This matter is remanded to the trial court in order for it to comply with our instructions to reconsider the sentence imposed.
 

 CONVICTION AFFIRMED; REMANDED FOR RECONSIDERATION OF SENTENCE.
 

 [1]
 

 . One of the five assigned errors is the trial court's denial of the motion for new trial. The motion for new trial was based upon the assigned errors which we will fully discuss in Parts II and III. Because we disagree with Mr. Lawrence that there was error, we need not tarry on this assignment. We pretermit consideration, as argued by the prosecution, that no appeal even lies from the denial of a motion for new trial.
 
 See
 
 La.C.Cr.P. art.
 
 *1005
 
 851(1) and
 
 State v. Snyder,
 
 98-1078 (La.4/14/99), 750 So.2d 832 (be cautioned, though, as
 
 Snyder
 
 has an extensive case history that does not merit inclusion in this footnote).
 
 But see State v. Caminita,
 
 411 So.2d 13, 17 (La.1982); and
 
 State v. Turner,
 
 365 So.2d 1352, 1355 (La.1978) ("This Court’s review of a trial court’s denial of a new trial motion based on [the ground that the verdict is contrary to the law and the evidence under La.C.Cr.P. art. 851(1)] is limited to the question of whether the trial judge has properly exercised his wide discretion.”)
 

 [2]
 

 . Also, as we always do, we have independently reviewed the record for errors patent.
 
 See
 
 La.C.Cr.P. art. 920(2). We discern no error patent.
 

 [3]
 

 . In the quote from
 
 Miller
 
 we have excised the following portion and replaced it with an ellipsis: "by clear and convincing evidence. Id.;
 
 State v. Davis,
 
 449 So.2d 466 (La.1984).”
 
 See
 
 La. C.E. art. 1104 which was adopted after Davis but before
 
 Miller.
 
 Article 1104 provides: "The burden of proof in a pretrial hearing held in accordance with
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.” Because in this case we are considering an "other crime” to which Mr. Lawrence judicially admitted, we need not delay discussing the burden of proof.
 

 [4]
 

 . Curiously, Mr. Lawrence seems to suggest that this prior act evidence is relevant and not substantially outweighed by the risk of unfair prejudice.
 
 See
 
 La. C.E. art. 404 A;
 
 see also
 
 our discussion in Part II,
 
 supra.
 

 [5]
 

 . Article 782 A provides, in pertinent part: "Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” It is virtually identical to the relevant provision of La. Const, art. I, § 17(A), which reads in pertinent part: “A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.”
 

 [6]
 

 . In
 
 Apodaca
 
 four justices concluded that the Sixth Amendment did not require unanimous juries and four justices concluded that the Sixth Amendment did require unanimity and that the Fourteenth Amendment applied the requirement to the states. The result in
 
 Apo-daca
 
 turned on the conclusion of a single justice that, while the Sixth Amendment had a unanimity requirement, the Fourteenth Amendment did not apply that requirement to the states.